NOTICE

Decision filed 01/14/22. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2022 IL App (5th) 210236

NO. 5-21-0236

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

_____

| | | |
|---|---|---|
| *In re* PARENTAGE OF K.E. | ) | Appeal from the |
| | ) | Circuit Court of |
| (Nathan W., | ) | White County. |
| | ) | |
| Petitioner-Appellee, | ) | |
| | ) | |
| v. | ) | No. 14-F-46 |
| | ) | |
| Lindsay E., | ) | Honorable |
| | ) | Michael J. Valentine, |
| Respondent-Appellant). | ) | Judge, presiding. |

_____

JUSTICE CATES delivered the judgment of the court, with opinion.
Presiding Justice Boie and Justice Wharton concurred in the judgment and opinion.

**OPINION**

¶ 1 Respondent, Lindsay E. (Mother), appeals from the judgment of the circuit court of White County, finding that it was in the best interest of the minor to allocate equal parenting time and joint decision-making responsibilities between the parties. Mother also claims that the trial erred when it allowed for the admission of an *ex parte* evidence deposition of the court-appointed expert witness. We reverse the judgment of the trial court and remand with directions.[1]

_____

[1]This decision was issued more than 150 days after the filing of the notice of appeal, for good cause, under Illinois Supreme Court Rule 311(a)(5) (eff. July 1, 2018), as the briefing schedule was amended pursuant to requests by both parties for extensions of time to file their respective briefs.

¶ 2                                    I. BACKGROUND

¶ 3    Mother and Nathan W. (Father) are the parents of K.E. Mother and Father were never married and their relationship ended before K.E. was born. Father was present for K.E.'s birth on September 17, 2009, although he did not sign the Voluntary Acknowledgment of Paternity (VAP) form. When K.E. was approximately one year old, Father filed a petition to establish paternity and for sole custody of K.E. That case was dismissed in 2013 for want of prosecution.

¶ 4                      A. The Extended Parentage and Visitation Proceedings

¶ 5    On December 22, 2014, when K.E. was five years old, Father filed this petition to establish paternity and visitation under the Illinois Parentage Act of 1984 (750 ILCS 45/3 (West 2014)). Mother filed a response to the petition. The trial court entered a mediation order directing Mother and Father to mediate child custody and child visitation issues. According to a June 22, 2015, mediator's report, the parties agreed to a temporary visitation schedule that was never formalized by court order.

¶ 6    On June 20, 2016, Father filed a motion for the temporary allocation of parenting time, seeking court ordered visitation. Father asserted in his motion that the parties had agreed to establish his parenting time on Saturday and Sunday from 10 a.m. to 6 p.m. every other week. The motion further asserted that Mother had withheld K.E. from Father and did not follow the visitation schedule agreed to during mediation. On June 24, 2016, without a hearing, the trial court entered an order awarding Father parenting time on Saturday and Sunday, every other week, from 10 a.m. to 6 p.m.

¶ 7    On July 25, 2016, Mother filed a motion to vacate the order entered on June 24, 2016, asserting the order was entered without a hearing or notice to Mother. Father hired new counsel and filed another petition for temporary relief requesting temporary allocation of parenting time.

2

Father additionally filed a petition for rule to show cause. He asserted that since the order granting parenting time was entered on June 24, 2016, Mother had failed to present the child for visitation and refused to answer telephone calls or reply to electronic communications regarding the missed visitation. On August 18, 2016, an agreed order was entered, granting Mother's motion to vacate, and the petition for rule to show cause was not pursued. Mother also filed her response to Father's petition for temporary relief and allocation of parenting time.

¶ 8    On September 20, 2016, Mother's counsel filed a motion to withdraw with Mother's consent. An order was entered that date, allowing Mother's counsel to withdraw. On November 9, 2016, Mother appeared *pro se* at a hearing on Father's petition for temporary relief for visitation. At the November 9 hearing, the trial court granted visitation to Father every other Saturday and Sunday from 10 a.m. until 6 p.m. until January 14, 2017. Starting the weekend of January 14, 2017, Father's visitation increased to every other weekend with overnight visitation on Saturdays. The order also established visitation time for Father on the day after Thanksgiving and on Christmas Eve. Exchange of the minor child was ordered to occur at the McDonald's restaurant in Carmi, Illinois.

¶ 9    On December 9, 2016, Mother hired new counsel, Roger White II. White filed a motion to vacate and motion to reconsider the order entered on November 9, 2016.[2] Mother requested that the trial court reconsider or deny the overnight visitation because Mother was *pro se* at the hearing. On January 12, 2017, two days before Father was to begin overnight visitation with K.E., Mother's attorney filed an emergency petition to limit Father's parenting time to every other weekend on Saturday and on Sunday from 10 a.m. until 6 p.m. each day. Mother asserted in her emergency

---

[2]According to this motion, Mother had requested a continuance of the November 9, 2016, hearing in order to hire new counsel, but this request was denied by the trial court.

petition that "Mother has informed the child [K.E.] of the upcoming overnight visitation and he becomes scared, visibly shaken and starts crying stating he does not want to go, but will not tell the Mother his reasoning." Mother's emergency petition included a request that the trial court order Father to consult with a mental health professional to develop age and developmentally appropriate parenting skills, communication skills, and empathy skills. In support of this request, Mother attached a report from Dr. Judy Osgood, Ph.D., a licensed clinical psychologist.

¶ 10    Dr. Osgood's report indicated that she had evaluated K.E. on January 7, 2017. K.E. was seven years old at that time. During K.E.'s interview with Dr. Osgood, K.E. began to cry when they talked about spending the night with Father. K.E. told Dr. Osgood that Father was "mean to him." K.E. provided two examples of Father being "mean." The first example occurred when K.E. was five years old. K.E. had refused to see Father, and Father pulled him out of Mother's house and "whipped" him. K.E. also reported an incident where Father asked about what K.E. had done on New Year's Eve. K.E. responded that they had gone bowling, but he could not remember where they had gone. Father told him, "You need a butt whipping for forgetting where you went bowling." K.E. additionally reported that he is "scared to say anything" during his visits with Father.

¶ 11    Mother was interviewed by Dr. Osgood separately from K.E. Mother reported an incident where Father had choked her when Mother's daughter and K.E. were present. The report did not include a date of the incident. The report also stated that Mother "expressed concerns that no one is really listening to K.E. and feels like she is being blamed for K.E.'s fear of staying overnight with his father." She explained that K.E. would hide in closets when Father arrived for pickups. Dr. Osgood had not interviewed Father.

4

¶ 12    Dr. Osgood concluded that K.E. was experiencing symptoms of posttraumatic stress disorder (PTSD) in relation to his Father. Dr. Osgood based her diagnosis of PTSD on K.E. experiencing emotional and physical abuse by Father. The two reported examples of abuse by Father were the incidents where Father gave K.E. a "butt whipping" when he was five years old and the statement by Father that K.E. needed a "butt whipping" for forgetting where he went bowling. Dr. Osgood strongly recommended that Father work with a mental health professional "to develop age and developmentally appropriate parenting skills, communication skills along with empathy skills with his son." She further opined that it was "critical that [K.E.] is able to experience safety, security, and trust with his Father prior to overnight visitation."

¶ 13    On January 12, 2017, the trial court entered a temporary emergency order suspending overnight visitation and set a hearing for January 17, 2017. On the day of the hearing, a guardian *ad litem* (GAL) was appointed at Father's request. Father additionally filed a motion to strike Mother's emergency petition for modification and to vacate the order of January 12, 2017. Father argued that the January 12, 2017, order had been entered *ex parte*. He claimed that *ex parte* emergency hearings were not permitted under section 603.10(a) of the Illinois Marriage and Dissolution of Marriage Act (Marriage Act) (750 ILCS 5/603.10(a) (West 2016)). Father also argued that Mother had not moved for an expert evaluation under section 604.10 of the Marriage Act (750 ILCS 5/604.10 (West 2016)), which provided the statutory authority to have a court-appointed expert evaluate the parties. Father then asked the court to appoint a mental health professional pursuant to section 604.10. At the conclusion of the hearing on January 17, 2017, the trial court extended visitation for Father to include every other Friday night.

5

¶ 14    B. The Court-Appointed Section 604.10(b) Professional

¶ 15    On February 14, 2017, the trial court entered an order appointing Dr. Althoff, a mental health professional, to evaluate the parties. Dr. Althoff completed a report on Father on August 28, 2017, and a report on Mother on September 4, 2017. On September 17, 2017, Dr. Althoff passed away and was unavailable for cross-examination by the parties as allowed under section 604.10(b) (750 ILCS 5/604.10(b) (West 2016)).

¶ 16    On April 19, 2018, Father filed another motion for temporary relief and asserted that he had not been able to have any overnight visitations with K.E. The motion also stated that the GAL had not submitted a report to the court and that Dr. Althoff had passed away. Father attached Dr. Althoff's report to his motion. The report suggested that more information was needed to determine whether Father was "using developmentally appropriate communication and other patterns of interaction with his son." Father claimed, however, that any challenges raised by Dr. Althoff's report did "not have to prohibit visitation."

¶ 17    A hearing on Father's motion for temporary relief was held on May 29, 2018. The trial court found that K.E. had "trust/fear issues" with respect to Father and ordered Father to attend 10 counseling sessions prior to exercising overnight parenting time. The trial court also incrementally increased visitation "with the first 4 being only 1 overnight stay per visitation. After the initial 4 overnights, they shall be increased to 2 overnights per visitation." The trial court reserved the issue of an extended overnight visitation during summer break until Father's counselor believed that K.E. was ready. In addition, the court ordered Mother and Father to cooperate and communicate with each other regarding K.E. and to allow K.E. "the opportunity to communicate" by phone with each parent at least once each day when overnight stays were exercised.

¶ 18     On June 6, 2018, after Mother moved to bar the mental health evaluation of the deceased Dr. Althoff, the trial court appointed a new mental health professional, Dr. Frank Kosmicki, Ph.D. Dr. Kosmicki, a licensed clinical psychologist, was ordered to perform mental health evaluations of Mother, Father, and K.E. The order also directed Dr. Kosmicki to perform a custody examination. The court permitted Dr. Kosmicki to obtain information previously relied upon by Dr. Althoff, including the "notes, raw testing, reports and conclusions of Dr. Althoff," to complete the mental health evaluations. Dr. Kosmicki was ordered to provide reports within 21 days of the conclusion of his evaluations.

¶ 19     Dr. Kosmicki performed psychological evaluations of Mother, Father, and K.E. and completed his report for the court on February 8, 2019. During the interviews with Mother and Father, Dr. Kosmicki performed a Minnesota Multiphasic Personality Inventory-2 (MMPI-2) and a Millon Clinical Multiaxial Inventory-IV (MCMI-IV) to gauge mental health and child custody considerations. Dr. Kosmicki also performed a Behavior Assessment System for Children-2nd Edition (BASC-2) Interpretation on K.E. to evaluate his behavior and self-perception.

¶ 20     Dr. Kosmicki initially interviewed Mother on September 15, 2018, and continued to interview and test Mother during five subsequent sessions. Mother reported that until K.E. was about a year and a half old, she withheld visitation and would not respond to Father's requests. Then, from when K.E. was about a year and a half until he was about five years old, Mother started to allow Father to see K.E. about two to four times a month. After the parties reached a temporary agreement for visitation as a result of mediation, Mother continued to withhold visitation because K.E. was "reporting significant distress around visitation with his father." Mother indicated that she would prefer that K.E. not have contact with Father. Mother additionally provided some background of her troubled adolescence. She refused to discuss certain details of her history for

7

fear that it would be used against her. Dr. Kosmicki reported that Mother was evasive and guarded around her history of substance abuse. She had been hospitalized in 2007 when she was diagnosed with a nonspecified psychotic disorder. After K.E. was born, Mother revealed that she was no longer taking psychotropic medications, but continued counseling.

¶ 21    Dr. Kosmicki initially interviewed Father on October 17, 2018, and for three subsequent interviews. Dr. Kosmicki reported that Father explained that he struggled to have a relationship with K.E. because Mother prevented visitation. Father reported that he did not believe K.E. was distressed during visitation and Father believed that K.E. "will flip the script on you. He'll go from being a normal kid to being totally shut down when his mom pull[s] in." Dr. Kosmicki indicated that Father believes his household is more structured than Mother's. Father explained that in 2017, the Department of Children and Family Services (DCFS) investigated Mother about her living conditions and mental health. Father additionally reported that K.E. was in a bicycle accident after the DCFS investigation and Mother did not inform Father of K.E.'s accident or hospitalization. Father reported that he was notified by the school of the bicycle accident after K.E. was absent for 12 days.

¶ 22    K.E. was interviewed by Dr. Kosmicki on two occasions. Each time, K.E. was accompanied by a different parent. Dr. Kosmicki observed that K.E. presented himself differently with each parent. Mother took K.E. to the first interview, and Dr. Kosmicki described K.E. as "shy, withdrawn, and quiet, and he evidenced noticeable speech articulation problems." When Father accompanied K.E., he was more confident, not withdrawn, and spoke without any speech articulation problems. K.E. reported that he did not want to spend as much time with Father and provided examples of Father's "mean" behaviors without prompting. These examples included Father spanking K.E. when he was five years old. Father had sent K.E. to his room because he was

8

crying, and Father did not allow K.E. to go see Mother when they were all at a high school football game. Dr. Kosmicki questioned K.E. about why he provided examples without prompting, and K.E. explained that he had met with Dr. Osgood in the past when he did not want to see Father. Dr. Kosmicki further stated that "the impression K.E. gave was that if he told this examiner the negative experiences he has had with his father in the past, he may not have to spend as much time with him." K.E. stated that when he was little, Mother told him that Father did not want to spend time with K.E. Mother talked to K.E. about custody issues and has told K.E. that Father wants to take K.E. away from her. Father does not talk to K.E. about custody issues.

¶ 23    Dr. Kosmicki's report concluded that both parents present with significant personality and psychological issues that impact parenting and their relationship with each other. Neither parent presented with a severe psychological dysfunction that would preclude them from performing parental responsibilities. Dr. Kosmicki's findings indicated that neither parent was unfit. Mother's presentation, history, and test results provided evidence of mental health issues. Dr. Kosmicki believed that Mother was "very sensitive to how she is being viewed and is desperately attempting to convey emotional stability despite apparent and serious mental health problems." Mother also "made extreme efforts to present herself in an unreasonably favorable light." Dr. Kosmicki also believed that Mother had "considerably influenced K.E.'s thinking about the world in ways that are distorted and seriously colored by her own paranoia, rumination, and other mental health factors." Mother's influence directly impacted issues related to K.E.'s relationship with Father.

¶ 24    Dr. Kosmicki concluded that Father presented as an independent and ambitious man who could be easily frustrated and overbearing. There was evidence that Father was physically abusive towards Mother in their relationship. Father also had a history of alcohol abuse, methamphetamine abuse, aggression, violence, promiscuity, and infidelity. Father could be critical and had failed to

9

adequately understand K.E.'s emotional needs. Dr. Kosmicki believed that Father did not adequately accept and understand K.E. as he is, a sensitive and gentle child. Dr. Kosmicki recommended that Father continue to attend counseling to learn how to retrain his "impulsive and demanding tendencies" and to "develop improved empathy" for K.E.

¶ 25    Dr. Kosmicki considered K.E.'s best interests and recommended that primary custody should remain with Mother. Dr. Kosmicki believed that any change in custody that would threaten K.E.'s relationship with Mother would likely alienate K.E. from Father. He also considered that it was possible for Father to have primary custody in the future, if he were to "foster a positive relationship" with K.E. Dr. Kosmicki further recommended that any effort by Mother to undermine K.E.'s relationship with Father or restricting time with Father should be "viewed by the courts as contemptuous and should be dealt with severely, as such efforts should be considered a continuation of her persistent efforts over the years to alienate [K.E.] from his father." Both parents should be required to seek mental health services. Dr. Kosmicki considered that a future change of custody may be appropriate after K.E. is more connected and feels safe with Father.

¶ 26    On May 9, 2019, Father filed a motion for temporary relief and requested a summer visitation schedule, along with a request to reinstate a weekday into the visitation schedule. Father asserted that he had completed 10 counseling sessions with K.E. in compliance with the May 29, 2018, order. Mother had revoked the scheduled visitation during the week, although she allowed Father to have K.E. for two overnight visits every other weekend.

¶ 27    A hearing was held on May 28, 2019, on Father's motion for additional visitation time. The trial court entered an order on June 25, 2019, extending Father's parenting time during the summer. The order also included counseling sessions for K.E. with Dr. John Cooley. Dr. Cooley was ordered to submit two reports per month directly to the trial court regarding the status of

counseling, and the parties' attorneys were not allowed to have direct contact with Dr. Cooley. Due to the relocation of the prior GAL, the trial court appointed a new GAL, Kelli Storkman.

¶ 28                    C. The Evidence Deposition of Dr. Kosmicki

¶ 29    On August 6, 2019, attorney Jason Drew entered his appearance on behalf of Mother, as co-counsel with attorney White. A motion for substitution of judge was filed August 16, 2019. On Wednesday, October 16, 2019, Father filed a notice of his intent to take an evidence deposition of Dr. Kosmicki. The deposition was set on Monday, October 21, 2019, at 1 p.m., in Carbondale, Illinois. Notice was e-mailed to opposing counsel.

¶ 30    On the morning of the deposition, Mother's counsel, Jason Drew, filed a motion to strike the notice of evidence deposition for Dr. Kosmicki. Drew's motion asserted that Father's counsel "never contacted counsel for Respondent in regards for setting this matter for said deposition on October 21, 2019, which violates the Local Rules of the Second Judicial Circuit." The motion further alleged that both of Mother's attorneys were unavailable for the deposition, as they had court appearances scheduled elsewhere. Therefore, Mother's counsel could not attend the deposition of Dr. Kosmicki.

¶ 31    Neither Mother nor her counsel appeared for the deposition of Dr. Kosmicki. Father's attorney proceeded *ex parte* with the deposition.[3] During Dr. Kosmicki's deposition, he not only testified to his report, but also testified to issues involving the reports submitted by Dr. Osgood. Dr. Kosmicki was concerned with the timing of Dr. Osgood's report because it was completed just before overnight visitation was set to begin and the incidents that Dr. Osgood reported on had occurred two years prior to drafting her report. Dr. Kosmicki stated that Dr. Osgood had diagnosed

---

[3]Father's counsel claimed that he was unaware of the motion to strike the notice of deposition filed by Mother's counsel.

K.E. with PTSD and had reasoned that K.E. should not be allowed to visit Father due to PTSD. Dr. Kosmicki explained that Dr. Osgood did not delineate a sufficient number of symptoms to back up her conclusion regarding the PTSD. He could not determine from Dr. Osgood's report if PTSD was a formal diagnosis. Dr. Kosmicki believed that Mother encouraged K.E. to repeat and focus on isolated incidents, including the spanking incident that was the basis of Dr. Osgood's diagnosis of PTSD. K.E. presented the spanking incident several times to Dr. Kosmicki as well. Dr. Kosmicki believed that Mother had encouraged K.E. to view Father's behavior during isolated incidents as an overall representation of Father's character.

¶ 32    In his deposition, Dr. Kosmicki was also concerned that even though Dr. Osgood never evaluated Father, she had given specific treatment recommendations for him. Dr. Kosmicki believed that it was important to evaluate both parents in custody cases because one or both parents may coach their children to respond in ways to favor one parent's case. In this case, Mother had a long history of telling K.E. information that had negatively impacted his relationship with Father. K.E. had reported to Dr. Kosmicki that Mother told K.E. that Father could have spent more time with him, but Father did not want to see K.E. Dr. Kosmicki testified that Mother had withheld visitation from Father because she was angry that they were no longer romantically together. Dr. Kosmicki further explained that Mother admitted to behavior that alienated K.E. from Father. Dr. Kosmicki believed that Mother's attempts to keep K.E. from Father allowed her to explain that Father was not interested in K.E. Dr. Kosmicki testified to Mother's difficulty in fostering a relationship between K.E. and Father. For example, Mother provided a cell phone to K.E. to communicate with him in secret while he was at Father's house. Dr. Kosmicki stated that Mother's behavior was not in the best interest of fostering a relationship between K.E. and Father. Dr. Kosmicki testified that Mother had a difficult time differentiating between her own needs and

12

K.E.'s needs, which resulted in Mother fostering behaviors to make K.E. dependent. Dr. Kosmicki explained that K.E. had become a "self-object" for Mother, which means that she "cares about [K.E.] to some degree, inasmuch as it serves her own emotional needs."

¶ 33    During Dr. Kosmicki's deposition, he explained that, from Mother's adolescence to her mid-20's, she had a history of "alcohol abuse, psychological problems, and acting-out behaviors." When Mother was 24 years old, she was hospitalized for psychotic symptoms. Dr. Kosmicki was concerned that due to Mother's history of psychological problems, she may not be able to parent K.E. if she experienced a "decompensation of her emotional condition." Dr. Kosmicki also believed that if Father's parenting time was increased too soon, K.E. would be traumatized because of the "maybe-too-close bond" K.E. had with Mother. In the future, Dr. Kosmicki opined that there should be more equitable parenting time.

¶ 34    On December 30, 2019, Dr. Cooley submitted a report to the court.[4] At that time, Dr. Cooley had met with K.E. several times and believed he was doing well. There were no behavioral problems with K.E. at home or at school. K.E. reported to Dr. Cooley that he had anxiety about seeing his father and said that "they treat him bad when he is there." Dr. Cooley believed that K.E. needed to "work through his feelings and accept that both of his parents want time with him." Dr. Cooley additionally reported, "I have not heard anything of real concern that would suggest any change of visitation."

¶ 35    On January 8, 2020, Father filed a response to the motion to strike the notice of deposition and attached multiple e-mail exchanges with Mother's counsel evidencing the attempts made by Father's counsel to schedule the deposition of Dr. Kosmicki. Father's attorney asserted that he first

---

[4]Although the record indicates that Dr. Cooley was to provide bi-monthly reports, the record contains only this reference to the December 30, 2019, report.

e-mailed attorney White on June 28, 2019, to coordinate the scheduling of the deposition. After Drew entered his appearance, Father's attorney sent Drew an e-mail on August 6, 2019, in an attempt to coordinate a date for Dr. Kosmicki's evidence deposition. On September 9, 2019, Father's attorney sent a follow-up e-mail asking for deposition dates. On October 7, 2019, Father's attorney e-mailed Mother's attorneys available dates for Dr. Kosmicki's deposition. Father's motion indicated that Drew replied within minutes, indicating that he would respond to the proposed dates by the end of the week. According to Father, Drew never responded. Therefore, Father's attorney filed a notice of deposition on Wednesday, October 16, 2019, without further communication to Drew or White, and set the deposition for Monday, October 21, 2019. Father's response sought sanctions and included a request for attorney fees.

¶ 36    The parties did not set the motion to strike the notice of Dr. Kosmicki's deposition before trial. Attorney Drew withdrew as counsel for Mother. Attorney Aaron Hopkins entered his appearance for Mother on February 24, 2020. Hopkins filed a notice of evidence deposition to depose Dr. Kosmicki on September 25, 2020. The record does not contain information about this deposition.[5]

¶ 37    A settlement conference was scheduled via Zoom for December 4, 2020. On December 18, 2020, a new trial judge was assigned to this case. Another settlement conference was scheduled for March 30, 2021, and a trial date was scheduled for April 26, 2021.

¶ 38    On April 13, 2021, Mother filed a motion for an *in camera* interview of K.E. Mother and Father both filed witness lists, and neither included Dr. Kosmicki as a witness. On April 23, 2021, Father filed the transcript of the October 21, 2019, evidence deposition of Dr. Kosmicki.

---

[5]Mother subsequently asserted that she never had an opportunity to cross-examine Dr. Kosmicki.

¶ 39                                    D. The Trial

¶ 40    On April 26, 2021, the trial began. Father was the first witness to testify. Father testified that he participated in a psychological evaluation by Dr. Kosmicki and participated in counseling with K.E., as ordered by the trial court. Father also testified that DCFS had contacted him after a complaint of abuse to K.E. The DCFS report was determined to be "unfounded." In the fall of 2019, after K.E. returned to school, Father had visitation with K.E. every other weekend, Friday to Sunday, and an overnight visitation on Wednesday. Father is married and has a five-year-old son with his wife. Father's wife had a daughter prior to their marriage who lives with them as well. K.E. gets along well with both children. The family frequently travels to Kentucky Lake to fish. They also golf together. Father built a basketball court at his house for K.E. Father is involved with K.E.'s education and frequently checks TeacherEase, an online program for parents to check their child's progress at school. Father testified to an incident where K.E. brought a cell phone into his house to secretly talk to Mother without Father's knowledge. He explained that he did not have a problem with K.E. contacting Mother during visitation but did have a problem with not knowing K.E. had a phone. Father also testified to an incident where K.E. was hospitalized after a bicycle accident at Mother's house. Father was not informed of this accident by Mother. He learned of the incident through TeacherEase because K.E. was absent from school.

¶ 41    On cross-examination, Father testified that his relationship with Mother ended before K.E. was born. Father testified that he went to one doctor appointment with Mother, purchased a crib, and was present for K.E.'s birth. Father admitted that he never signed a VAP. He was also asked about an incident in 2010, when he allegedly choked Mother. Father stated that he did not recall the incident. He denied ever attacking Mother in K.E.'s presence. Father admitted to spanking K.E. on one occasion in 2014, after K.E. ran into the road. Father was questioned about an incident in

15

2020 where he allegedly loaded a firearm in the car in front of his children. He denied brandishing a weapon in front of his children while driving. Father admitted that a loaded gun was in the car while they were traveling.

¶ 42    After Father testified, his attorney brought to the trial court's attention that an evidence deposition of Dr. Frank Kosmicki had been filed on April 23, 2021, along with Dr. Kosmicki's report and Dr. Althoff's report. Mother's attorney objected to the evidence deposition and objected to Dr. Kosmicki's report being entered into evidence. The parties then argued Mother's motion to strike the notice of evidence deposition that had been filed on October 21, 2019. Mother's attorney argued that the deposition was taken without the presence of Mother or her counsel and that the deposition taken on October 21, 2019, should not be allowed into evidence. The trial court questioned the parties and asked what rule had been violated. Mother's counsel argued that under local rule 9(k),[6] counsel preparing the notice of hearing had the responsibility to make a good faith effort to coordinate mutually convenient hearing dates with the court and opposing counsel. Mother's attorney asserted that because the deposition was noticed untimely and without agreement, it should be stricken. Mother's counsel also argued that Dr. Kosmicki could be subpoenaed to appear during either of the two additional trial dates—May 24, 2021, or June 28, 2021.[7]

¶ 43    Father's attorney argued that he had followed the local rules and the rules of civil procedure regarding depositions. Since Father's attorney had made several attempts to schedule the

---

[6]Local rule 9(k) stated as follows: "Coordination of Hearing Date. It is the responsibility of counsel preparing the notice of hearing to make a good faith effort to coordinate with the court and all opposing counsel to set the hearing at a time that is mutually convenient. The filing of the notice of hearing shall constitute a certification of compliance with this rule." 2d Judicial Cir. Ct. R. 9(k) (Apr. 13, 2007).

[7]The trial court had previously indicated that it would set aside these additional dates for the trial of this matter.

deposition, as required by local rule 9(k), without response from opposing counsel, he argued that he was allowed to set the deposition by filing a notice. Father's counsel additionally argued that the timing of the deposition, five days after e-mailing notice, was sufficient. He stated that it was proper to take an evidence deposition of a doctor and it was not necessary to show a doctor's unavailability. Father's attorney further argued that from the time of the evidence deposition until that moment during trial, 19 months later, Mother's attorneys had not requested to schedule a deposition of Dr. Kosmicki or cross-examine him on his report.

¶ 44 The trial court admitted the evidence deposition over the objection of Mother's counsel, finding that local rule 9(k) had been followed. The court acknowledged that the notice was filed on Wednesday, October 16, 2019, and the deposition was taken on the following Monday, October 21, 2019. The trial court made no other findings, did not order that a supplemental deposition be taken, and did not request that Dr. Kosmicki appear at trial.

¶ 45 After the deposition was entered into evidence, Father called his wife, Lauren W., to testify. Lauren testified that K.E. wanted to spend time with Father. She noted that when K.E. was at their house, they would go fishing, golf, play basketball, and watch movies. K.E. also liked to spend time with his half-brother. Lauren testified that K.E. brought a cell phone into their house that was given to him by Mother. Lauren stated that K.E. was allowed to call Mother whenever he asked, but they did not tolerate "sneaking and lying." When questioned about showing K.E. and her children a firearm during a car ride to St. Louis, Lauren denied the incident, but acknowledged owning a gun and having brought the gun on the trip.

¶ 46 Father additionally called family friends to testify. Amy Whitely, a family friend, testified that her children would play with K.E. when Father had visitation. Whitely taught fourth grade at K.E.'s school. She testified that K.E. did not have issues communicating with other children,

17

Father, or his wife. Whitely described K.E. as a fun and happy child that liked to joke around with Father.

¶ 47    Jacob Campbell, also a family friend, testified on Father's behalf. Campbell indicated that he and his family have spent time together with Father's family at Kentucky Lake. Campbell testified that he has witnessed K.E. appear anxious at times around other children, but never around Father. He described K.E. as a nice and polite child.

¶ 48    A friend of Father's, Lance Barbre, testified. Barbre explained that when he spent time with Father's family, there were usually children around that liked to wrestle. He further indicated that K.E. enjoyed wrestling. Barbre never witnessed any issues with K.E. but he did notice that K.E. would become quiet after it appeared that he was having fun playing with other kids.

¶ 49    After Barbre testified, Father rested. Other than offering the deposition of Dr. Kosmicki, Father did not call Dr. Kosmicki to testify or rely on any another mental health expert.

¶ 50    Mother testified on her own behalf during the presentation of her case. Mother testified that she had a 20-year-old daughter who attended Southern Illinois University. Mother rents property and is an assistant schoolteacher. She testified to an incident that occurred either in 2009 or 2010 when Father choked her in front of her daughter and K.E. Between 2011 and 2013, Father had limited contact with K.E. when she would not hear from Father for months at a time. In 2014 or 2015, after Father came to Mother's work several times, she allowed Father to see K.E. Mother testified that K.E. refused to go with Father for visitation. When Father started having visitation, an incident occurred when Father came to Mother's house to pick up K.E. Father carried K.E. outside to his truck because K.E. refused to go with Father. Mother believed K.E. attempted to run back inside to the house. Father caught K.E. and "beat his butt." Mother testified that K.E. would cry and hide in the closet when it was time for Father's visitation. At times, Father would leave

18

without seeing K.E. because K.E. refused to spend time with him. Mother explained that it was not uncommon for K.E. to witness Mother and Father yell at each other.

¶ 51    In September 2017, DCFS contacted Mother due to allegations of environmental neglect in her home. The allegations were "unfounded." The day DCFS inspected her home, K.E. was in a bicycle accident and taken by ambulance to St. Louis Children's Hospital. Mother testified that K.E. suffered a two-millimeter bleed on his brain and he was treated for a concussion. She did not call Father after the accident. She testified that when the first overnight visitation was scheduled, K.E. did not want to go. He was crying and had a hard time breathing. Mother bought K.E. a cell phone to help him feel safe for the overnight visitation. K.E. had a "meltdown" at school because of the overnight visitation. When overnight visitation increased to two nights per visitation, K.E. would not only cry, but he would vomit before he would have to go to Father's home. During the summer of 2019, Mother called DCFS to report Father based on K.E.'s refusal to return to Father's house. K.E. told Mother that the incident involved K.E. not wanting to go to golf lessons which upset Father's wife. Mother described K.E. as a "happy-go-lucky kid" that struggled with visitation with Father.

¶ 52    Father's attorney used Dr. Kosmicki's report to cross-examine Mother. Mother testified that sections of Dr. Kosmicki's report were incorrect, including his statement that: Mother and Father dated when K.E. was two years old; that Father was able to see K.E. two to four times a month until K.E. was five; that Mother continued to restrict Father's access to K.E.; that Mother had a difficult time promoting a positive relationship between K.E.; and, that Mother did not pursue child support because she worried it would give Father claim over K.E. Mother testified that she was hospitalized at the Mulberry Center in 2007 after an emotional breakdown. Mother explained

19

that the incident occurred before K.E. was born. Mother also testified that she had taken K.E. to see Dr. Osgood approximately 12 times and Dr. Osgood had spent numerous hours with K.E.

¶ 53 Dr. Osgood was called to testify on Mother's behalf. Dr. Osgood indicated she had prepared a report dated January 9, 2017. In the January 9, 2017, report she had diagnosed K.E. with PTSD and recommended that overnight visitations with Father be suspended and that Father work with a mental health professional. Dr. Osgood had prepared another report on April 20, 2018, and indicated that K.E. appeared more distressed about experiences he had with his Father. Dr. Osgood provided an example of K.E. being upset after Father did not believe K.E. Father's friend told him that K.E. had "flipped him off" and K.E. denied the incident. K.E. had anxiety and trouble sleeping due to fear of being criticized. K.E. also stated that Father had "kneed me in the gut then kneed me in my mouth, he gave me a bloody lip" while wrestling even though K.E. did not want to wrestle. Dr. Osgood recommended that Father work with a mental health professional to gain parenting and empathy skills. Dr. Osgood had also prepared a report dated May 20, 2019. The May 20, 2019, report included K.E. reporting that Father made an issue of K.E.'s weight, and that Father got upset with K.E. without reason. K.E. had expressed that he wanted to spend less time with Father. The three reports written by Dr. Osgood were admitted into evidence. Dr. Osgood also testified that Mother had "not at all" negatively influenced K.E. against Father. Dr. Osgood explained that she had asked K.E. about Mother's influence and Mother had always encouraged parenting time with Father.

¶ 54 The GAL testified that it was her recommendation that both parents should share parental responsibilities of K.E. She testified that she read the reports written by Dr. Osgood and Dr. Kosmicki. The GAL testified that she was appointed late in the case after Dr. Kosmicki completed his report and after Father's parenting time had increased. She additionally stated that Dr.

Kosmicki recommended a gradual increase in Father's parenting time and that after the report was completed, Father's time was increased. She was able to witness K.E. interact with Father after they had the opportunity to spend more time together. Although K.E. told the GAL that he did not want to see Father, the GAL did not attribute a lot of weight to this statement because K.E. could not articulate a reason. The GAL questioned Dr. Osgood's analysis of K.E.'s behavior during his time with Father because Dr. Osgood did not interview Father or his wife and the GAL was able to make those observations. During her testimony, the GAL also suggested that the trial court review Dr. Kosmicki's report regarding parent alienation. The GAL believed it would be beneficial to K.E. if Mother and Father had equal parenting time.

¶ 55    K.E. was interviewed by the trial court. K.E. stated that Father and his wife will "act nice in front of people" but when other people are not at the house, they "won't act nice." He also stated that, "I don't really talk there," while he spends time at Father's house. He told the court that he did not like being away from Mother and felt lonely at Father's house. K.E. stated that he swam, played basketball, and played video games when he was at Father's house. When at Mother's house, he played basketball, watched movies, and swam. He had friends over at Mother's house but had not asked Father about spending time with friends.

¶ 56    After the interview with K.E., the parties rested their respective cases. During closing argument, Father's counsel relied heavily on testimony from Dr. Kosmicki's evidence deposition. Counsel argued that Dr. Kosmicki had testified that Mother was likely to engage in irresponsible and immature behavior and that she had negatively influenced K.E.'s relationship with Father. Counsel further stated that "Dr. Kosmicki specifically said, both parents will have some difficulties fostering a positive relationship between K.E. and the other parent, although [Mother's] difficulties toward that goal are more impactful and problematic."

21

¶ 57 During Mother's closing argument, her counsel also relied on Dr. Kosmicki's deposition testimony. Her attorney argued that Father was easily frustrated and overbearing. Father had a "history of abuse, aggression, violence, promiscuity, infidelity" and evidence of physical abuse to Mother. Dr. Kosmicki further opined that Father's "overbearing and demanding nature is often experienced by [K.E.] as being overwhelming and at times frightening and intimidating." Father did not always seem "attuned to [K.E.'s] emotional needs." Mother's counsel further argued that K.E.'s anxiety would lessen with less time around Father and requested that the court either maintain the status quo or lessen Father's time with K.E.

¶ 58 After closing argument, the trial court stated that it had considered all of the evidence, the credibility of the parties, and the witnesses. The court specifically stated it had considered the applicable factors set forth in sections 602.5 and 602.7 of the Marriage Act (750 ILCS 5/602.5, 602.7 (West 2020)) in regard to K.E.'s best interest. The court also stated that it had considered information K.E. relayed during the *in camera* interview, taking into account K.E.'s age and level of maturity. The trial court found that both parties were loving parents and felt that they had K.E.'s "best interests at heart." The court noted that Dr. Osgood testified that Mother had "not at all" negatively influenced K.E. against Father. The trial court did not agree with Dr. Osgood's assessment. Specifically, the trial court stated, "based on my view of this case, considering all of the evidence, considering the testimony of the witnesses, I just didn't find that truthful. Maybe she [Dr. Osgood] believes that. I just don't agree with that." The trial court also questioned Dr. Osgood's PTSD diagnosis, based on the incident of spanking and the other incident of K.E. roughhousing with Father. The trial court did not believe those instances supported a diagnosis of psychological abuse, emotional abuse, and berating. The trial court stated that the GAL was very credible and had spoken to everyone involved in the case. Consideration was given to the

22

witnesses' testimony regarding Father's need to work on empathizing with K.E. before visitation time was increased. The trial court found that Father's parenting time needed to be increased to develop this relationship. The trial court concluded that Mother should be the primary individual for purposes of custody determination. The court granted Father's request that he be awarded joint decision-making responsibilities for education, medical, religious, and extracurricular activities. In addition, the court awarded equal parenting time between the parties and established visitation. This appeal followed.

¶ 59                                    II. ANALYSIS

¶ 60     Mother first claims that the trial court erred when it admitted the evidence deposition of Dr. Kosmicki, the court-appointed expert witness, because Dr. Kosmicki was not subject to cross-examination. Mother additionally claims that the trial court's judgment awarding joint decision-making and equal parenting time between the parties was against the manifest weight of the evidence.

¶ 61     We initially consider Mother's claim that the trial court erred in admitting the evidence deposition of Dr. Kosmicki. Rulings on discovery matters are reviewed under the abuse-of-discretion standard. *Bankers Life & Casualty Co. v. American Senior Benefits LLC*, 2017 IL App (1st) 160687, ¶ 29. The trial court has the discretion to admit or exclude evidence, and the trial court's decision will not be overturned on appeal absent an abuse of discretion. *Bauer v. Memorial Hospital*, 377 Ill. App. 3d 895, 912 (2007). When the trial court's decision to admit or exclude an evidence deposition is based entirely on an interpretation of law, we review the matter *de novo*. *In re Marriage of Daebel*, 404 Ill. App. 3d 473, 492 (2010).

¶ 62     We begin our analysis with the observation that Dr. Kosmicki was appointed by the trial court as an independent expert witness. Section 604.10(b) of the Marriage Act allows the court to

23

seek advice from a professional to determine the child's best interest. 750 ILCS 5/604.10(b) (West 2020). Section 604.10(b) further provides that a professional consulted by the court "shall testify as the court's witness and be subject to cross-examination." 750 ILCS 5/604.10(b) (West 2020). A witness is regarded as "subject to cross-examination" when he is placed on the stand, takes the oath, and responds willingly to questions. See generally *People v. Bryant*, 391 Ill. App. 3d 1072, 1082 (2009) (citing *United States v. Owens*, 484 U.S. 554, 561 (1988)). The opportunity to cross-examine witnesses and to inspect the evidence offered against a party are part of guaranteeing the exercise of due process in a custody hearing in a trial court. *In re Marriage of Bates*, 212 Ill. 2d 489, 513 (2004). Both sides may cross-examine a court's witness and may impeach that witness. *People v. Robinson*, 46 Ill. App. 3d 713, 718 (1977).

¶ 63   Evidence depositions are fully admissible as to what a witness would testify to in a courtroom if a witness is unavailable. *Ainsworth Corp. v. Cenco Inc.*, 158 Ill. App. 3d 639, 646 (1987). Illinois Supreme Court Rule 212(b) (eff. Oct. 1, 2020) addresses the use of evidence depositions. Under Rule 212(b), "[t]he evidence deposition of a physician or surgeon may be introduced in evidence at trial on the motion of either party regardless of the availability of the deponent, without prejudice to the right of either party to subpoena or otherwise call the physician or surgeon for attendance at trial." Ill. S. Ct. R. 212(b) (eff. Oct. 1, 2020). Rule 212(b) further provides that all or part of other evidence depositions may be used for any purpose if the court finds that at the time of the trial

> "(1) the deponent is dead or unable to attend or testify because of age, sickness, infirmity or imprisonment;
>
> (2) the deponent is out of the county, unless it appears that the absence was procured by the party offering the deposition, provided, that a party who is not a

24

resident of this State may introduce his or her own deposition if he or she is absent from the county; or

(3) the party offering the deposition has exercised reasonable diligence but has been unable to procure the attendance of the deponent by subpoena; or finds, upon notice and motion in advance of trial, that exceptional circumstances exist which make it desirable, in the interest of justice and with due regard for the importance of presenting the testimony of witnesses orally in open court, to allow the deposition to be used." Ill. S. Ct. R. 212(b) (eff. Oct. 1, 2020).

¶ 64    Mother argued that the admission of Dr. Kosmicki's evidence deposition was error because the trial court did not find that the court-appointed expert witness was unavailable under Rule 212(b). In this case, the parties presented no evidence that Dr. Kosmicki was unavailable or that Father's counsel made an effort to procure Dr. Kosmicki's presence at trial.

¶ 65    Nevertheless, this court notes that Dr. Kosmicki was located in Carbondale, Illinois, which is located in Jackson County, and that the trial commenced in White County. See *Aurora Loan Services, LLC v. Kmiecik*, 2013 IL App (1st) 121700, ¶ 37 ("An appellate court may take judicial notice of readily verifiable facts if doing so will aid in the efficient disposition of a case, even if judicial notice was not sought in the trial court." (Internal quotation marks omitted.)). Therefore, pursuant to Rule 212(b)(2), Dr. Kosmicki was located outside of White County and was, therefore, unavailable for trial. Given that Dr. Kosmicki was located outside of the county in which these proceedings were ongoing, the evidence deposition would have been admissible under Rule 212(b)(2). The record, however, is devoid of any acknowledgement by the parties of the applicability of this rule.

25

¶ 66    Instead of arguing that Dr. Kosmicki was "unavailable," Father's counsel argued that because Dr. Kosmicki was a "doctor," his evidence deposition was admissible regardless of his availability. We disagree. Rule 212(b) provides that "[t]he evidence deposition of a *physician or surgeon* may be introduced in evidence at trial on the motion of either party regardless of the availability of the deponent." (Emphasis added.) Ill. S. Ct. R. 212(b) (eff. Oct. 1, 2020). The Medical Practice Act of 1987 (225 ILCS 60/2 (West 2020)) defines a "physician" as a person licensed to practice medicine or a chiropractic physician. Dr. Kosmicki is a licensed clinical psychologist under the Clinical Psychologist Licensing Act (225 ILCS 15/3 (West 2020)). Dr. Kosmicki is not a physician or a surgeon. His deposition, therefore, should not have been admitted as if he were a physician, as Rule 212(b) was not applicable.

¶ 67    Mother next argues that insufficient notice was provided prior to scheduling Dr. Kosmicki's deposition under Illinois Supreme Court Rule 204(a)(2) (eff. July 1, 2014). Rule 204(a)(2) provides that a deponent shall respond to a lawful subpoena served by certified or registered mail at least seven days before the deposition date. Ill. S. Ct. R. 204(a)(2) (eff. July 1, 2014). Mother's attorney argued that opposing counsel should also have received at least seven days' notice of the scheduling of Dr. Kosmicki's deposition and that the five days' notice received was insufficient.

¶ 68    Father's counsel responded that he had complied with local rule 9(k). Local rule 9(k), however, relates to motion hearings, not notices of depositions. Local rule 9(k) states that "[i]t is the responsibility of counsel preparing the notice of hearing to make a good faith effort to coordinate with the court and all opposing counsel to set the hearing at a time that is mutually convenient." 2d Judicial Cir. Ct. R. 9(k) (Apr. 13, 2007). The trial court relied upon the local rule, found it had been complied with, and then admitted the deposition of Dr. Kosmicki. This was error.

26

¶ 69    Father's counsel also argued that reasonable notice of the deposition was provided under Illinois Supreme Court Rule 206 (eff. Oct. 1, 2019). According to Rule 206(a), "[a] party desiring to take the deposition of any person upon oral examination shall serve notice in writing a reasonable time in advance on the other parties." Ill. S. Ct. R. 206(a) (eff. Oct. 1, 2019). The question, then, is what constitutes a "reasonable time" in advance of taking the deposition. Oftentimes, local rules provide some guidance in this regard. The local rule relied on by the parties in this case is not helpful because it applies to the scheduling of hearings, not depositions. Had Dr. Kosmicki been subpoenaed to testify in this case, he would have had seven days to respond to the subpoena. Therefore, it seems unrealistic to allow the witness seven days to respond to the subpoena but not to allow opposing counsel at least the same amount of time to respond to the notice of deposition. Here, a notice of deposition was e-mailed to opposing counsel on a Wednesday for a deposition that was to occur the following Monday. We find that under the unique circumstances of this case, the scheduling of the deposition five days after the notice was sent was not a reasonable amount of time pursuant to Rule 206(a).[8] Ill. S. Ct. R. 206 (eff. Oct. 1, 2019). For this reason, the trial court erred in admitting the evidence deposition of Dr. Kosmicki.

¶ 70    Father's counsel argues, in his defense, that he had tried to accommodate opposing counsel by e-mailing requests for deposition dates on prior occasions. Mother's counsel either did not respond or promised a response that never came. While the frustration of Father's counsel is understandable, the resolution of this matter was not to simply schedule the deposition and hope the opposing party would appear. Rather, Father's counsel should have invoked the provisions of

---

[8]By allowing seven days for notice in this case, we are, by no means, setting a bright-line rule for the definition of what constitutes a "reasonable time" pursuant to Rule 206(a).

27

Illinois Supreme Court Rule 201(k) (eff. July 1, 2014) in an attempt to obtain a resolution for scheduling Dr. Kosmicki's deposition.

¶ 71 Under Rule 201(k),

> "[e]very motion with respect to discovery shall incorporate a statement that counsel responsible for trial of the case after personal consultation and reasonable attempts to resolve differences have been unable to reach an accord or that opposing counsel made himself or herself unavailable for personal consultation or was unreasonable in attempts to resolve differences." Ill. S. Ct. R. 201(k) (eff. July 1, 2014).

The purpose behind Rule 201(k) is to "urge counsel to adopt a spirit of cooperation with regard to discovery." *In re Marriage of Lai*, 253 Ill. App. 3d 111, 115 (1993). We acknowledge that Father's counsel sent a couple of e-mails to Mother's attorneys, but Father's counsel did not show he had made reasonable attempts to resolve the discovery dispute pursuant to Rule 201(k). There was no personal consultation made, as required by the rule. Instead, Father's counsel moved forward with the deposition *ex parte*, which resulted in Mother not having the opportunity to cross-examine the witness. We cannot embrace this trial tactic under these circumstances. In the event the parties could not agree on a date for the deposition, the party requesting the deposition should have filed the proper motion with the trial court, which could have included a request for sanctions pursuant to Illinois Supreme Court Rule 219 (eff. July 1, 2002).

¶ 72 Illinois Supreme Court Rule 219(c) (eff. July 1, 2002) authorizes a trial court to enter any order that is "just" to remedy a party's unreasonable failure to comply with the discovery rules. *Kubicheck v. Traina*, 2013 IL App (3d) 110157, ¶ 28. The purpose of a "just" order of sanctions is to advance discovery and encourage a trial on the merits. *Kubicheck*, 2013 IL App (3d) 110157,

28

¶ 28. The trial court had the authority to stay the proceedings until a new (or supplemental) deposition was taken, allowing Mother's counsel to cross-examine the court's witness.

¶ 73     We next consider Dr. Kosmicki's position as the court-appointed expert. Section 604.10(b) of the Marriage Act allows the court to seek advice from a professional to determine the child's best interests. The advice must be in writing and provided to the court not later than 60 days before the hearing on the allocation of parental responsibilities. 750 ILCS 5/604.10(b) (West 2020). Contrary to this rule, Dr. Kosmicki's report, dated February 8, 2019, was provided to the court on the morning of the first day of trial, April 26, 2021. Additionally, Dr. Kosmicki did not update his report within 60 days of the trial date. The February 8 report was outdated, as it was completed more than two years prior to the first day of trial. It discussed allowing Father to have incremental visitation with K.E. Since the time of that report, however, the trial court had already increased Father's overnight visitation.

¶ 74     It is clear that the trial court considered Dr. Kosmicki's evidence deposition and report when making its determination regarding the allocation of parental responsibilities and parenting time with K.E. Reliance upon the outdated report of Dr. Kosmicki was error under the statute and rendered the court's findings and conclusions against the manifest weight of the evidence. Therefore, we must vacate the judgment of the trial court and remand this matter for further proceedings.

¶ 75     In doing so, we cannot avoid the observation that Mother and Father have had a relationship that can only be characterized as toxic. Although the record indicates that the parties have been able to be cordial with one another at times, the facts demonstrate that they are unable to accomplish the simple task of transferring K.E. for visitation without the use of a "neutral zone"—

29

here, the McDonald's restaurant in Carmi, Illinois. This is so, despite the fact that both parents live in the same small community, approximately 10 minutes from one another.

¶ 76    Given the parties' relationship and the fact that the proceedings in this case have dragged on for years, we find it necessary, upon remand, to set some basic parameters so that the disputed issues can be expeditiously resolved on remand for K.E.'s benefit. Therefore, upon remand, Mother and Father, and their respective counsel, are urged to work together so that K.E.'s visitation experience, whatever that may turn out to be, can be accomplished in a setting that works to the benefit of the child, not to the acrimony of the parents. Further, the trial court should direct its court-appointed professional to complete an evaluation and submit an updated report on the best interest of K.E., in accordance with section 604.10(b) of the Marriage Act.

¶ 77    Within a reasonable time after the issuance of the mandate, the parties shall appear for a pretrial conference, as allowed by Illinois Supreme Court Rule 218 (eff. Oct. 1, 2021). During that pretrial conference, the trial court, with input from the parties and counsel, should issue a case management order providing deadlines for supplementing discovery; dates for the completion of the report by the court's expert professional; and, upon the request of any party, dates for the deposition(s) of the court-appointed professional for purposes of discovery, evidence, or both. The trial court shall also set a date for the trial of this matter, which shall occur no less than six months after the issuance of the mandate in this case.

¶ 78    Upon the completion of the trial in this case, the trial court is strongly urged to review the best interest factors and to state, on the record, the bases for any judgment rendered. The trial court is also directed to take into account the child's preference and make every effort to avoid an exchange at the McDonald's restaurant.

¶ 79    Finally, Illinois Supreme Court Rule 366(a)(5) (eff. Feb. 1, 1994) gives a reviewing court, in its discretion, the power to grant any relief that the case may require, including the authority to assign a new judge on remand. *Eychaner v. Gross*, 202 Ill. 2d 228, 279 (2002). The interests of justice are best and most efficiently served by assigning this case to a different judge on remand. Accordingly, we are remanding this case to the chief judge of the circuit court for reassignment to a different judge for future matters and for compliance with the directions herein.

¶ 80                                    III. CONCLUSION

¶ 81    For the foregoing reasons, we reverse the judgment of the trial court and remand this case to the chief judge of the circuit court for further proceedings as directed herein.

¶ 82    Reversed and remanded with directions.

**No. 5-21-0236**

| | |
|---|---|
| **Cite as:** | *In re Parentage of K.E.*, 2022 IL App (5th) 210236 |
| **Decision Under Review:** | Appeal from the Circuit Court of White County, No. 14-F-46; the Hon. Michael J. Valentine, Judge, presiding. |
| **Attorneys for Appellant:** | Michael G. DiDomenico, of Lake Toback DiDomenico, and Paul L. Feinstein, both of Chicago, for appellant. |
| **Attorneys for Appellee:** | Daniel K. Cockrum and Patrick Hunn, of Hunn Law Group, of Harrisburg, for appellee. |