2022 IL App (1st) 211144-U

THIRD DIVISION
May 11, 2022

No. 1-21-1144

**NOTICE**: This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

_____

| | | |
|---|---|---|
| *In re* PARENTAGE OF M.M.: | ) | |
| | ) | Appeal from the |
| (M.M., Father, | ) | Circuit Court of |
| | ) | Cook County |
| Petitioner-Appellee, | ) | |
| | ) | 15 D 79517 |
| and | ) | |
| | ) | Honorable |
| M.U., Mother, | ) | Maritza Martinez, |
| | ) | Judge Presiding |
| Respondent-Appellant.) | ) | |

_____

JUSTICE ELLIS delivered the judgment of the court.
Presiding Justice Gordon and Justice McBride concurred in the judgment.

**ORDER**

¶ 1    *Held*: Affirmed in part, vacated in part, remanded. Court's modifications to allocation-of-parental-responsibility and parental-time judgment were not against manifest weight of evidence or abuse of discretion. Portion of order granting right of first refusal is vacated and remanded for sole purpose of clarifying relevant window of time that would trigger that right. Portion of order denying injunctive relief is vacated and remanded for clarification.

¶ 2    M.M. is a minor child, born out of wedlock, to M.M. and M.U. To preserve anonymity but avoid the confusion of identical initials, we refer to the parties as "Child," "Father," and "Mother," without meaning offense for the impersonal references.

¶ 3 In 2016, when Child was age two, the unmarried parents agreed to an allocation judgment establishing their respective parental rights. But their animosity towards each other quickly led to conflict.

¶ 4 To remedy what each perceived as abuses by the other, they filed pleadings related to the allocation judgment. Mother sought to modify the judgment, while Father filed a rule to show cause for parenting abuses. After a hearing on all matters, the court entered an intricately detailed, "rule heavy" allocation judgment that sought to address specific sources of conflict.

¶ 5 Before this court, Mother challenges the modified allocation judgment. We consider the appeal on her brief only, as Father did not file a response. For the following reasons, we affirm in part, vacate in part, and remand for further proceedings as discussed below.

¶ 6                                 BACKGROUND

¶ 7 The parents are veteran officers of the Chicago Police Department (CPD) who never married. In 2013, Child was born, and Father signed a voluntary acknowledgment of paternity. In 2015, he filed a petition to establish a parenting schedule. Shortly after that petition was filed, the court appointed Zachary Williams as guardian *ad litem* (GAL). In 2016, the court entered an initial allocation judgment and agreed parenting plan. The initial allocation judgment was quite lengthy and contained several provisions regarding situations that might arise due to the parents' duties as officers. For example, CPD has "day off groups." Instead of assigning individual officers a schedule, they set the schedule for an entire group and assign officers to them. CPD officers also have mandatory furlough days and receive "comp time" for working overtime.

¶ 8 The initial judgment attempted to incorporate these profession-specific days off to allow the party taking time to "trump" the other's normal parenting time. Overall, the initial judgment

2

was intended to be flexible, while providing some guidance on how the parenting schedule should be handled. The judgment emphasized the need for the parents' "cooperation."

¶ 9     When the parties first agreed to parenting time, their schedules did not overlap much, and they had "separate" days. But shortly after the allocation judgment, Mother was promoted to detective. With the promotion came a change in schedule. And with that change came considerable overlap in the parties' time off, leading to a great deal of conflict over who would receive time with Child and when.

¶ 10    In 2017, Mother filed a petition to modify the parenting schedule, largely based on Father's refusal to recognize her new day-off group. For example, Father repeatedly attempted to drop off Child at Mother's house knowing full well that she was still at work. He did so under the auspices that they had to "follow the court order," which had incorporated her *prior* schedule. In the most extreme of many examples, Father took the extraordinary step of filing a non-criminal report against Mother because she was not home at the drop-off time. On the other side, Father claimed that Mother regularly interfered with his right to a phone call with Child and would constantly schedule things over his parenting time. Ultimately, Mother sought sole custody and decision making, while Father sought his fair right to co-parent.

¶ 11    Over the course of approximately three years, the court entered various interim orders regarding the parties' rights and obligations. Finally, in September 2020, the court began trial on the parties' respective filings. During trial, the parents, GAL, and various family members testified. Much of the testimony consisted of the parties simply reading text messages sent through the court ordered communications programs, "Talking Parents and Our Family Wizard."

¶ 12    As described above, Mother and Father also testified about the conflict between them. Throughout their testimony, several distinct areas of conflict became apparent, including the

vagueness of allocation judgment; Father's inflexibility towards the judgment; "time trumping;" vacations, holidays, and time off; phone calls with Child; and extra-curricular activities. Connected with these issues was the question of whose obligation it was to find (and pay for) childcare services when neither parent was available.

¶ 13     According to Mother, one of the largest recurring issues was "the mid-day drop off at 2:45," due to Father's refusal to recognize Mother's new work schedule. Knowing that her and Father's work hours now overlapped, she believed the problem would be solved if "each of us [had] our own parenting time and not this constant conflict or the constant exchanges between the two of us." Mother's other principal concern was Father signing Child up for extracurricular activities that conflicted with Mother's parenting time. Specifically, the evidence showed that these obligations—baseball games—often conflicted with Mother's plans to travel with Child to her parent's lake house. Historically, her solution was to simply skip the extracurricular obligation altogether.

¶ 14     And this refusal to take Child to extracurriculars formed one of Father's biggest complaints. During his testimony, he reiterated that, in his opinion, extracurriculars were good for children, and that Child was a gifted athlete. Without question, his biggest complaint was that Mother, twice, decided to skip the last baseball game of the season, when Child would receive his trophy and be part of end-of-season celebrations. Father's other main issue was Mother's refusal to allow nightly phone calls. He testified that she often put the call on speaker phone. Besides the obvious lack of privacy, this also allowed ambient noise to interfere with the conversation.

¶ 15     Aside from the parents, the other major witness was Williams, the GAL. Through his testimony, he did not mince words and made it very clear that Mother and Father were good

parents and had a lot to offer Child. And while they had done a fine job of insulating Child from their conflict, that conflict was significant and intense. He opined that both were very rule-oriented and controlling of their parenting time. He testified that without "clear" rules, their joint decision making would remain "dysfunctional." He was adamant that the court needed to craft a clear delineation of responsibilities.

¶ 16    Williams believed the only plausible solution was a clear parenting schedule with strict limitations on the "time trumping" that each had committed in various ways. He proposed that Mother retain the majority of parenting time, with Father's regular parenting time being his days off (assuming they did not conflict with Mother's). If they did conflict, "only one day should be taken from either parent, not two days if there's two that conflict." He also believed that the only time the two should be able to "trump" each other is for full furloughs. As he explained, "as to baby furlough and comp time, enough with that. You can't just all of a sudden say I've got a comp day, I'm going to take your day in the middle of a week or whatever. If you want to use a comp day, use it for a holiday. If you can't use it for a holiday, so be it. Get some errands done or something." And when their furloughs or "priority time" overlap, the GAL proposed a weekly rotation as who got to trump whom.

¶ 17    Williams also had very specific proposals for other areas. Their right of first refusal (the ability to take extra parenting time when the scheduled parent was unavailable) should be limited to overnights without the parent. And when a parent was not available for "their" time, it would be that parent's obligation to arrange childcare. He also said that phone calls did not have to be every night. Instead, they should only be on days when the parent did not see the child at all.

¶ 18    Finally, he believed it was in the best interest of Child to fully participate in extracurriculars—at least most of them, if not every game or practice. The GAL was critical of

Mother's refusal to set aside her plans to allow Child to participate in the trophy ceremonies—"That's what being a parent is all about. At some point—at some point, you know, you have to go—you have to take your kid to an extracurricular activity or take them to something that you don't want to take them to ***." The GAL also agreed that the court should ease some of the travel restrictions, so Mother could take Child out of state to visit family without Father's consent.

¶ 19    In the end, the GAL was "not really that interested in inequality for either one of the parents at this point. What I think is important is that [Child] knows where he's going to be and gets to spend time with either parent. I mean, I think that's the most—that's the most fair solution."

¶ 20    A few months after the initial trial, the court briefly re-opened proofs to verify the parents' work schedules. Ultimately, in July 2021, the court issued a lengthy memorandum order. As the memorandum order is 56 pages, single-spaced, we only provide a broad overview.

¶ 21    After meticulously going through the testimony, the court went through "17" factors. The court found most of these factors to be inapplicable or neutral. A few, the court found in Father's favor. None of the factors favored Mother.

¶ 22    For most of these factors, the court focused on Father's willingness to place Child's extracurriculars in front of his own plans—in contrast to its critique of Mother. The court found that Father had been candid about his past "vile" behavior in the parties' "acrimonious history," recognizing his mistakes and showing sincere remorse. Ultimately, the court found Father "wishes to co-parent [Child] with [Mother]." In contrast, Mother sought "sole Allocation of Parental Decision Making."

¶ 23    The court denied Father's rule to show cause, concluding that the allocation judgment

was too vague on the issue of phone calls to find Mother in violation. The court also refused to enjoin Father from filing noncriminal police reports for parenting time disputes, though the court admonished Father that it would take any further reports as evidence of his refusal to cooperate.

¶ 24    The court opted to modify the allocation judgment to "reduce[] ambiguity" and "set[] clearer rules" in the hope that it would "resolve conflict in areas where [the parents] have previously had problems and failed to cooperate with each other."

¶ 25    First, the court clarified the right of first refusal. According to the modification, the right triggered "[i]f a parent is ever not available to be with [Child] during his or her Parenting Time." It also added provisions that obligated the parents to provide the full name and telephone number of Child's caretakers in the event the parent with parenting time was unavailable. Additionally, it obligated the party who has parenting time (either regularly or as an exercise of their right to first refusal) to find appropriate childcare when they were unavailable. Finally, unless otherwise agreed, if a parent accepted additional parenting time, they would be obligated to take Child to regularly scheduled activities. Relatedly, the court expressly ordered that the parties share childcare costs, "regardless of who has possession of the minor child."

¶ 26    Relating to their jobs, the court ordered each party to accept changes in their Day-off groups. The court also prohibited the parents from using "Personal Days, Compensatory Time, or Time Due during the other parties' Parenting Time to gain additional Regular Parenting time with" Child except when "the other party is **actively working**" and "the other parent has not similarly" exercised those options. (Emphasis in original.)

¶ 27    As for Regular Parenting Time, the court believed that Mother should be "allocated the majority of parenting time over" Child. The court made clear, however, that the schedule it was establishing only remained "**[f]or so long as [Mother] has non-rotating days off**." (Emphasis

7

in original.) In the event of a change, particularly if the parties had the same days off, they would be obligated to immediately notify the court if they could not reach an alternative agreement. Mother was granted "all parenting time with [Child] that is not specifically allocated to [Father]."

¶ 28    For Father, the court granted him Regular Parenting Time for

"the entire period of time he enjoys off when he is scheduled to have his Regular Day Offs [*sic*] as delineated in the FOP Calendar, minus necessary travel time, without any interruption whatsoever from [Mother], regardless of whether that period for him coincides in any way with any one or all of her Regular Days Off."

Father's time begins

"at the time his Regular Work Day is scheduled to end, plus the travel time required for him to pick up [Child], shall continue through his Regular Days Off, and then will not end until approximately one hour before his Regular Work Day shift is scheduled to begin, the approximation accounting for the travel time that [Father] needs in order to arrive at work on time."

If Child is "sleeping, at school, or involved in an extracurricular activity" at the time of Father's parenting time, Father's time begins at the "earliest possible available opportunity for [Father] to take possession of [Child]." The order prohibits Father from interrupting sleep, school, or extracurricular activities to exercise his time.

¶ 29    If the parties cannot arrange for "direct exchanges between them," they are "equally responsible" for finding childcare. The court then chastised Father for his rigid view that his time ends *exactly* at 2:45. Instead, if Mother is not available at the start of his shift, he is responsible for arranging childcare. In that circumstance, Child can be taken to Mother's house or left at his

house for Mother to pick up—assuming there is childcare available.

¶ 30    The court allowed each party to "trump" the other with "Furloughs and Baby Furloughs" so long as there is "Parity in Parenting Time"—basically equal opportunity for the other to exercise the same "trump." To avoid conflict, "[t]he parties are advised to use every effort to coordinate the taking of different Furlough and Baby Furlough / Furlough Segment dates." If the parties select the *same* Furlough dates, the court determined that the party who places them in the shared Our Family Wizard calendar "**first**" gets priority and it is "incumbent upon [the other] to select another Furlough next, in order to exercise [their] next desired Furlough Parenting Time."

¶ 31    The court also created a detailed schedule of which parent had custody of the Child for which holiday, including personal holidays—birthdays and the like—and school holidays. Their assignments rotate. For example, Mother gets New Year's Day in even years, Father in odd. For non-holiday "Special Occasions," the court wrote that it would be

> "in the discretion of the parent whose Parenting Day it is to either take [Child], or to allow the other parent to take [Child], to the Special Occasion(s) that [Child] is invited to. The parties are advised to schedule their Special Occasions, and to request their families to schedule their Special Occasions, on days that [Child] is scheduled to be with their respective parents/families, if they want to be certain that [Child] will be in attendance at the Special Occasion."

¶ 32    The court then created a hierarchy to explain what it considered as taking precedence when determining who has parenting time. From highest to least priority the court ranked days as: Holidays, Birthdays, Spring and Winter School Breaks, Furlough, Baby Furlough, Father's regular time off, Mother's Regular Parenting Time, and Special Occasion in which Child is a participant. The court gave "NO" priority to an "Occasion When [*sic*] [Child] is a Spectator."

¶ 33     For phone calls, the court created a simple rule: If Child isn't spending the night with that parent, Child gets a private phone call with them. "For example, if the minor is with his grandparents on a fishing trip, then he will call each of his parents that evening." To remedy Father's complaint, "the call, or such other agreed upon method, is to take place in a location free of distractions and outside extraneous noises."

¶ 34     Finally, the court continued to allow each parent to enroll Child in one extracurricular activity per quarter, "without the need to consult or receive permission from the other party." However, that activity must "be in the neighborhood where [Child] attends school and lives." The provision continued:

> "Neither party may allow [Child] to miss a kickoff parade, practice, meet, game, or the like, that jeopardizes [Child's] ability to continue to be considered an active participant in his enrolled extracurricular activity. [Child] may, however, for example, miss a few practices in a summer season to enjoy some weekend fishing trips with his grandparents, as long as he isn't in jeopardy of being kicked off of the team because he has missed the majority of practices.
>
>      Under **no circumstances** is [Child] to miss **any** last, championship, trophy or ceremonial practice, meet, game, or the like, unless the parties otherwise agree in writing. [Child] shall also attend **all** of his own award ceremonies in person." (Emphasis in original).

¶ 35     After this lengthy order, Mother filed a motion to reconsider nearly every modified provision because "whether intended or not, that [*sic*] are not in the best interest of the child; contradicts the recommendations and investigation of the Guardian *ad litem* and will necessarily yield disparate parenting time between the parties and a gross imbalance of power between the

10

parties, thus increasing, not decreasing conflict and litigation."

¶ 36    In clarifying, the court first explained that it created the hierarchy and structure of the parenting time for Child "to enjoy time with each parent without either parent pulling the rug out from under the other parent, with respect to parenting time." It explicitly stated "[i]t is in the best interests of the minor child that it be patently clear which time supersedes other times."

¶ 37    A major part of Mother's argument lay in the court's finding that *no* factor supported her. To that point the court said:

> "After careful consideration of all seventeen criteria evaluated by this Court in the allocation of parenting time, each criteria either favored neither parent or favored [Father]. No single factor out of all considered seventeen factors favored [Mother]. Despite that, the Court recognized that the minor is very closely bonded with each parent and it is in the minor's best interests that [he], at a minimum, be able to enjoy equal time with the parties surrounding their Furloughs and Baby Furloughs. This Court clarifies that each parent is be [*sic*] mindful when they are scheduling time, that they will exercise over the minor during their Furloughs and Baby Furloughs, that it is in the minor's best interests that the minor share the same amount of time with the other parent, either immediately before or immediately after the Furlough and Baby Furlough Parenting Time. To that end, the other parent does have the ability, either immediately before or immediately after the Furlough and Baby Furlough Parenting Time exercised, to use Personal Days, Compensatory Time, or Time Due to assimilate an equal number of parenting time days and overnights, if he or she chooses. The ability of either parent to assimilate an equal number of parenting time days and overnights immediately before or after the other party's exercise of parenting time over Furloughs and Baby Furloughs

11

discourages either party from monopolizing entire seasons and prevents either party from stringing together an inordinate period of time with the minor without the other parent being able to do the same. This best interests of the minor concept, that the minor be afforded as described above, despite the fact that no single factor favors [Mother], is synthesized, for lack of a better term, to 'Parity Days.'"

¶ 38    Within 30 days of this clarification, Mother filed her notice of appeal.

¶ 39                                    ANALYSIS

¶ 40    Mother raises several issues on appeal. Father failed to file an appellee's brief. As such, we ordered the matter taken on Mother's brief only. Our review of the record, particularly the trial court's extensive and meticulous order, convinces us that we may resolve this appeal on the appellant's brief alone. See *First Capitol Mortgage Corp. v. Talandis Construction Corp.*, 63 Ill. 2d 128, 133 (1976) (allowing consideration of appeal on appellant's brief only when record is straightforward, and errors may be easily considered).

¶ 41                          I. Consideration of Statutory Factors

¶ 42    Initially, Mother claims we should vacate the judgment because the court applied an incorrect version of the statutory factors. The court, she claims, applied the "January 1, 2015 version" of the relevant provision of the Illinois Marriage and Dissolution of Marriage Act (Act), when in fact the version effective January 1, 2016 was the operative and proper one.

¶ 43    To understand this argument, some clarification is in order. At the outset of its analysis of the allocation of parental decision-making responsibility and parenting time, the court correctly noted the appropriate sections of the Act that address these questions, namely section 602.5 (decision-making responsibility) and section 602.7 (parenting time). See 750 ILCS 5/602.5, 602.7 (West 2020). Each of those provisions contains a list of factors in considering the best

interests of the child on the respective questions. *Id*. Neither section even existed until the legislature's comprehensive overhaul of the Act that became effective January 1, 2016. See Pub. Act 99-90, §§ 5-15, 5-20 (eff. Jan. 1, 2016) (repealing several provisions of Act and replacing them with others, including new sections 602.5 and 602.7).

¶ 44   After mentioning the two appropriate sections to consider the child's best interests regarding allocation of parenting decision-making and parental time, the court wrote the following, which we reproduce verbatim to understand Mother's position:

> "Those best interests pursuant to 750 ILCS 5/602.5(c)(1-1-15) include [t]he following
>
> seventeen criteria: ***."

¶ 45   Mother notes that section 602.5(c) provides 15, not 17 factors for consideration. And she reads the parenthetical following the court's citation to the statute—"(1-1-15)"—as indicating the date of January 1, 2015. From this, she concludes that "[t]he January 1, 2015, version of the statute applied by the court apparently had 17 factors," while the current version has only 15. Thus, she argues, the court applied the wrong version of the statute.

¶ 46   Mother's confusion is perfectly understandable, but we ultimately find no reversible error on this point. First, the parenthetical "(1-1-15)" seems to us clearly to be a typographical error. Perhaps the court meant to write "1-1-16," indicating the date of January 1, 2016. Or the court may have meant to write "(1-15)," as in "one through fifteen," which would correspond to the number of best-interest factors contained in subsection (c) of section 602.5. Under this reading, the court would have been citing to "750 ILCS 5/602.5(c)(1-15)."

¶ 47   Either way, as noted above, section 602.5 did not exist before January 1, 2016. So if nothing else, we are confident that the court did not apply an earlier version of it.

¶ 48    But that leaves Mother's second point, which is that section 602.5 contains only 15, not 17, factors for consideration. And she also claims that, while the court initially mentioned section 602.7 as well, the court did not consider those factors at all, at least not explicitly.

¶ 49    Again, while we understand the confusion, a little unpacking shows that no error occurred. First, Mother is correct that section 602.5 contains 15 factors that the court shall consider when determining the allocation of parental decision-making responsibility in the child's best interests. See 50 ILCS 5/602.5 (West 2020). She also correctly notes that section 602.7, concerning parenting time, contains 17 best-interest factors. *Id.*

¶ 50    It seems clear to us that, though the order only purported to be citing the factors of section 602.5, in fact the court was combining the factors in sections 602.5 and 602.7, which are similar and, in some cases, identical. (It should not be surprising that many of the factors relevant to the allocation of parental decision-making authority would overlap with factors relevant to allocating parenting time.)

¶ 51    We are confident this is the case because the 17 factors the trial court explicitly considered included all 15 factors from section 602.5, as well as two others that are not contained in section 602.5 but *are* included in section 602.7. Those two factors are "(12) The willingness and ability of each parent to place the needs of the child ahead of his or her own needs" and "(16) The terms of a parent's military family-care plan that a parent must complete before deployment if a parent is a member of the United States armed Forces who is being deployed." 750 ILCS 5/602.7(b)(12), (b)(16) (West 2020).

¶ 52    If we put aside those two factors, which are unique to section 602.7, the other factors contained in section 602.5 are not materially different from—and in many cases are identical to—those in section 602.7. For example, each statute identically requires the court to determine

14

"the willingness and ability of each parent to facilitate and encourage a close and continuing relationship between the other parent and the child." *Id.* §§ 602.5(c)(11), 602.7(b)(13). Likewise, each requires consideration of "the child's adjustment to his or her home, school, and community." *Id.* §§ 602.5(c)(2), 602.7(b)(6). Those are not the only examples of identical provisions among the two statutes.

¶ 53    And the provisions of sections 602.5(c) and 602.7(b) that are not identical are nearly so, which is to say that they use identical language but then tailor them to the respective topic in question, be it decision-making responsibility (section 602.5) or parenting time (section 602.7). For example, both statutes require that the court consider "the wishes of the child, taking into account the child's maturity and ability to express reasoned and independent preferences as to" decision-making or parenting time, respectively. *Id.* §§ 602.5(c)(1), 602.7(b)(2). The court shorthanded that factor as "[t]he wishes of the child," clearly intending to incorporate both subsection (c)(1) of section 602.5 and subsection (b)(2) of section 602.7.

¶ 54    As another example, each statute requires consideration of "any prior agreement or course of conduct between the parents relating to" either decision-making or caretaking, respectively. *Id.* §§ 602.5(c)(6), 602.7(b)(4). The court shorthanded that factor as "[a]ny prior agreement or course of conduct between the parents," again clearly intending to invoke the relevant subsections of each of the two statutes.

¶ 55    So while we understand Mother's confusion, and perhaps the circuit court's order could have benefitted from a more explicit mention that the court was collapsing two different statutes' best-interests factors into one analysis, we ultimately have no doubt that the court considered all relevant factors following an exhaustive recitation of its findings of fact.

¶ 56    To that we would add that, even if one viewed the order as failing to explicitly cite a statutory factor, the court is not required to make explicit findings or reference each factor, as long as the record shows that the court considered them. See *In re G.L.*, 2017 IL App (1st) 163171, ¶ 43 (analysis of section 602.7); *Jameson v. Williams*, 2020 IL App (3d) 200048, ¶ 47 (section 602.5). Here, Mother points to no factor that the court failed to consider, and given the court's detailed findings, we find none, either. We thus reject Mother's first argument.

¶ 57                                    II. Allocation Judgment

¶ 58    On the merits of the court's order, Mother claims various errors in how the court weighed the factors and the ultimate modifications the court made.

¶ 59    Custody and care issues are "within the sound discretion of the trial court." *In re G.L.*, 2017 IL App (1st) 163171, ¶ 24. We will not reverse a court's allocation of parenting time or decision-making responsibility unless it is against the manifest weight of the evidence. *Jameson*, 2020 IL App (3d) 200048, ¶¶ 48, 52; see also *In re G.L.*, 2017 IL App (1st) 163171, ¶ 24 (reviewing court " 'will not reverse a trial court's custody determination unless it (1) is against the manifest weight of the evidence, (2) is manifestly unjust, or (3) results from a clear abuse of discretion.' ") (quoting *In re B.B.*, 2011 IL App (4th) 110521, ¶ 32).

¶ 60    A decision is against the manifest weight of the evidence if "an opposite conclusion is apparent or when the court's findings appear to be unreasonable, arbitrary, or not based on evidence.' " *Jameson*, 2020 IL App (3d) 200048, ¶ 47 (quoting *In re Marriage of Verhines*, 2018 IL App (2d) 171034, ¶ 51). In essence, we will affirm the court's ruling if there is any basis in the record to support it. *In re G.L.*, 2017 IL App (1st) 163171, ¶ 24.

¶ 61                                    A. Improper Focus on One Topic

¶ 62    Mother first argues that the court arbitrarily fixated on a single topic—that of the child

16

missing a few extracurricular activities, most notably trophy ceremonies for his baseball league—allowing that handful of incidents to "poison" its consideration of the other factors. The record does not support this claim.

¶ 63    A major portion of the parties' conflict and testimony at trial revolved around Child's extracurricular activities. Each parent was upset—Mother, because Father signed Child up for extracurriculars without consulting her and which often conflicted with her parenting time; and Father, because Mother refused to take Child to those activities. Father testified that he believed extracurricular activities were healthy and important for a young child. The GAL testified to largely the same. There is nothing "arbitrary" about the court focusing its rulings on a major source of conflict between the parties.

¶ 64    Nor do we believe the court's consideration of these events "poisoned" its consideration of the factors. Indeed, we find the trial court's ultimate judgment to be far less one-sided than Mother's argument would indicate.  On a macro level, the sum and substance of this judgment was that each parent shared blame for the acrimony and lack of cooperation but, on the other hand, proved to both be good, loving parents; the parents thus required unusually specific rules going forward to govern their conduct; and neither side deserved the more extreme relief they sought—Mother's request for sole decision-making authority, Father's request for a contempt finding against Mother.

¶ 65    That was reflected on a micro level, as well. The court found that most of the factors it considered did not favor one parent over the other. To the extent that the issue of extracurricular activities favored Father, the court certainly indicated as much but confined its findings to that topic. For example, the court found that the factor of "each parent's participation in past significant decision-making" favored Father as to extracurricular activities, because he signed

17

Child up for most of the activities and showed a willingness "to set his own needs aside" to promote those activities, whereas Mother, at least at times, did not. But the court found that this same factor did not favor either parent when it came to matters of "education, health, and religion."

¶ 66     Far from finding that the trial court's fixation on one issue poisoned its overall judgment, we find the court's judgment to have been even-handed, reasonable, and well supported by the evidence.

¶ 67                               B. Joint Decision-Making

¶ 68     Next, Mother argues that the court erred in retaining joint decision-making, as opposed to granting her request for sole decision-making authority. She claims that "no reasonable person would conclude that joint decision-making is in [Child's] best interests."

¶ 69     We have recognized that "[j]oint custody requires an unusual level of cooperation and communication from both parents." *In re Marriage of Swanson*, 275 Ill. App. 3d 519, 524 (1995). And while we certainly agree that the record showed the absence of such cooperation in many instances, it does not automatically follow that the proper remedy was to give all decision-making authority to one parent and deny it altogether to the other, a rather drastic result itself. The court charted a less extreme path, allowing joint decision-making but providing very detailed rights and instructions.

¶ 70     The GAL, for his part, thought co-parenting was possible under those same circumstances—as long as the parents were given specific instructions and guidelines:

> "Q. Okay. And in dealing with both [Mother] and [Father] over the course of approximately five years, do you think that they have the capacity to coparent as to major decisions for their child?

A. So I don't think that they—I think with a clear delineation of responsibilities where one person has the final say, they can coparent. However, anything that calls for an agreement I think is a—is probably not—I mean, is not going to work.

So in the traditional sense of whether or not they can coparent, come to decisions on their own, I do not believe that typically they can. They will have times when they agree on things, but they're both very rule-oriented, so there would have to be rules in place, and there has to be a final decision. There has to be someone that has a final decision on each area."

¶ 71    The court clearly took guidance from and based its ruling on the GAL's recommendations. The court did not, as Mother claims, wholly ignore the long history of acrimony between the parents. It simply chose a different path than granting sole decision-making authority to one parent, opting instead to craft a co-parenting allocation judgment that contains very specific and detailed rules to reduce the possibility of conflict. We cannot say that the court abused its discretion, that its reasoning was arbitrary, or that the opposite conclusion is plainly evident.

¶ 72                                  C. Prioritization of Time

¶ 73    Within the co-parenting judgment, Mother challenges the court's allocation of Parenting Time as "convoluted" and "unenforceable." Specifically, she argues that "the court created an arbitrary and capricious hierarchy of parenting time that effectively diminishes both the importance and actual practice of [Mother]'s parenting time"—referring back to the hierarchy of importance discussed above. (See *supra* ¶¶ 31-32.)

¶ 74    But this "hierarchy" neither adds Parenting Time nor facilitates the parents' previous habit of "trumping." Instead, it explicitly "illustrate[s] what this Court Orders and deems as

taking precedence in the event of any conflict." To that end, its purpose is to reduce uncertainty and conflict when both parents claim a right to parenting time.

¶ 75    Take the New Year's Holiday listed as an example above. As a reminder, Mother is entitled to Child on New Year's Day in even years. Let's assume that this day is also one of Father's regular days off, or even a furlough day. "Normally," Father would be entitled to "all" his regular days off and could claim a furlough day as well (as could Mother). Absent this hierarchy, there would be an obvious conflict—Mother would want the Holiday with Child; Father would want his furlough day with him. But this hierarchy provides a "quick guide" to determine whose time takes priority. And in this example, the "arbitrary" hierarchy would protect Mother's parenting time on the New Year's holiday.

¶ 76    Nor does the hierarchy add confusion; quite the opposite. It merely incorporates other provisions into a quick guide of sorts. It incorporates a portion of the Holiday provision: "Holiday and special day parenting time shall take precedence over other Parenting Time wherever applicable." And another: "Where the Holiday and special day parenting time falls on a day during Spring, Winter or Summer breaks, the Holiday and special day parenting time shall take precedence over the Spring or Winter breaks parenting time, wherever applicable." Again, that, too, is simply reflected in the hierarchy. And when they both claim the "same" priority— such as furloughs—the court's order separately provides for who gets priority.

¶ 77    Reading this "priority" provision in conjunction with the testimony leaves no doubt that the court was trying to achieve precisely what the GAL testified was needed: very distinct rules on who gets Child, when. While the court's ultimate rules varied somewhat from the GAL's recommendations, the court has wide discretion in crafting these orders. See *In re G.L.*, 2017 IL App (1st) 163171, ¶ 24.

20

¶ 78    Will this resolve all conflict or, as Mother claims, merely lead to more acrimony? Time will tell, but there is no question that the court took its best stab at trying to balance the interests as equitably as possible with specific, detailed rules. The parties, of course, are free to seek additional modifications in the future, should any or all of these rules prove unworkable. For now, however, the court's current plan is well supported by the evidence and strikes us as an even-handed attempt to balance the competing interests of the parents—their obvious conflict with one another and their undeniable love, caring, and support for Child.

¶ 79                              D. Right of First Refusal

¶ 80    Mother next complains that the court's ordering of a "right of first refusal" was in error in that, contrary to statute, the court failed to identify the period of time for which a parent will be unable to care for the child before this right is triggered.

¶ 81    Section 602.3 of the Act gives the trial court discretion to allow for a "right of first refusal." 750 ILCS 5/602.3(a) (West 2020). A right of first refusal means that "if a party intends to leave the minor child or children with a substitute child-care provider for a *significant period of time*, that party must first offer the other party an opportunity to personally care for the minor child or children." (Emphasis added.) *Id*. § 602.3(b). Absent an agreement by the parties, the court must determine the length of time that would be sufficiently "significant" to trigger this right. *Id*. § 602.3(b)(1).

¶ 82    The court is entitled to considerable leeway in identifying that period of time; we will not reverse this fact-intensive determination unless it is against the manifest weight of the evidence. See *In re Marriage of Whitehead and Newcomb-Whitehead*, 2018 IL App (5th) 170380, ¶ 40. We have upheld determinations that a "significant period of time" might mean a period of eight hours or more. See *id*. ¶ 41. We have upheld a decision that applied the right of first refusal only

when the parent was unavailable overnight. See *Jameson*, 2020 IL App (3d) 200048, ¶ 58. In each case, we took into account that the parents were uncooperative with one another, and the longer the period of trigger time, the less often the parents would have to interact. See *id*.; *Newcomb-Whitehead*, 2018 IL App (5th) 170380, ¶ 40.

¶ 83    In the original allocation judgment, the court set the triggering period as whenever the parent entitled to parenting time "is out of town and/or will otherwise be unavailable overnight." In its modified order, however, the court failed to include that language. Instead, the order reads: "[i]f a parent is *ever* not available to be with [Child] during his or her Parenting Time, he or she shall first offer his or her time with [Child] to the other parent as soon as that parent is aware of his or her unavailability." (Emphasis added.)

¶ 84    Mother's complaint is that the word "ever" places no minimum floor on the length of time, including an hour or even minutes, and she fears that Father—who, by his own admission, has on occasion been overly literal in his interpretation of the court's order—will abuse this provision.  Consider, for example, a scenario where Mother needed an hour of childcare for Child while Mother visited the doctor; under the literal terms of the court order, Father would be entitled to parenting time during that hour and could claim that Mother was in violation for not so informing him.

¶ 85    In all likelihood, this was a mere oversight; the court probably intended to re-incorporate the same triggering period from the original judgment, which the GAL endorsed in his testimony as well. But the statute requires that the order specify the length of time that triggers the right of first refusal. See 750 ILCS 5/602.3(b)(1) (West 2020). And oversight or not, the modified allocation judgment does not currently contain that information. Thus, while we otherwise find the right of first refusal to be a perfectly proper exercise of the court's discretion, we vacate that

portion of the order and remand to the trial court to specify what "significant period of time" (*id.* § 602.3(b)) is required before triggering the right of first refusal.

¶ 86                                    E.  Injunctive Relief

¶ 87    In Count 7 of the amended motion to modify the allocation judgment, Mother sought to enjoin Father from "filing noncriminal police reports against [Mother] for an alleged violation of the Allocation Judgment or in response to a parenting dispute." The amended motion was filed on March 3, 2019. Two months later, on May 2, 2019, the parties appeared for a status hearing at which some issues were resolved either by agreement or court order.  One of them concerned this request by Mother embodied in Count 7.

¶ 88    The record reflects that Father stipulated that he would refrain from filing noncriminal police reports over what he perceives as violations of the allocation judgment. Thus, on May 2, the court entered the following order: "[Father] stipulates, and is therefore ordered, to not utilize/call the police for alleged or actual violations of the Custody Judgment."

¶ 89    As far as we can tell from the record, when the parties went to a full trial on the issues raised by the parties the following year, the substance of Count 7 was not re-litigated in terms of evidence or testimony. At the very end of her closing argument, Mother's counsel requested that

> "in addition to the prior stipulation whereas [Father] said he would not involve the police, I would like a clarification on that, that it also extends to filing criminal reports or noncriminal reports as the threat of that remains. So I'd ask Your Honor to not allow that to go afoul by the doctrine of merger and to keep that stipulation in any new order that is crafted by this Court that police intervention should be in the event of an emergency only, a legitimate emergency, not to report an alleged violation of this parenting agreement. That is inappropriate in this case and is not in the child's best interest."

¶ 90    It does not appear that Father's counsel addressed the matter at all in closing.

¶ 91    In its final judgment modifying the allocation agreement, the court "denied" injunctive relief as to Count 7, finding that Mother "does not meet the requisite standard for this Court to grant her request that [Father] be enjoined from filing noncriminal police reports against her for alleged violations of the Allocation Judgment and/or parenting disputes." The order continued:

> "[Father] is admonished, however, that if he continues the practice of filing noncriminal police reports against [Mother] for alleged violations of the Allocation Judgment and/or parenting disputes, it may be interpreted by this Court as his refusal to cooperate with [Mother], which is a factor that this Court must consider when allocating parental responsibilities and parenting time, pursuant to 750 ILCS 5/602.5(b)."

¶ 92    Mother moved to reconsider this portion of the judgment, reminding the court that at the hearing in May 2019, Father had "stipulated to not utilize the police department for enforcement of the civil order," which stipulation the court incorporated into its May 2019 order, and "[b]ased upon that stipulation, [Mother] did not actively pursue Count VII of her Amended Motion in that it was already resolved." Mother claimed there was "no basis to override the stipulation" by Father and deny injunctive relief.

¶ 93    The court made some modifications to its initial judgment in response to the motion to reconsider but did not amend this portion of its judgment order.

¶ 94    On appeal, Mother reiterates the point she made below, that the court had already granted her injunctive relief, by way of Father's stipulation no less, and the court thus had no basis to reverse itself.

¶ 95    We find merit to Mother's position. The modified allocation judgment, in denying injunctive relief to Mother because she did not meet the requisite standard, did not address the

fact that Father had previously stipulated to that very relief, nor did the judgment order even reference its previous order in May 2019 granting such relief based on Father's stipulation.

¶ 96    It may be the case that the court found that circumstances warranted a fresh look at an order previously entered, but we have pause in reaching that conclusion, given the lack of any mention of Father's stipulation or the previous order granting Mother the very injunctive relief the court was now denying.

¶ 97    Mother seeks reversal of this portion of the modified allocation judgment, asking that we grant the injunctive relief. But it is not clear to us that the court committed error. It would be more accurate to say we are not entirely sure of the court's reasoning. Thus, in our view, the proper course is to vacate this portion of the modified allocation judgment and remand to the trial court for further proceedings, giving the trial court the opportunity to revisit this question, in whatever manner the court deems appropriate, and then clarify its judgment.

¶ 98                              III. Assignment of New Judge

¶ 99    Finally, at the conclusion of her brief, Mother requests that the case be assigned to a new trial judge on remand. She complains of the delay in the order's issuance following the closing of proofs as well as the unreasonableness of the order itself. We have acceded to such requests in the past and have sometimes taken them on our own, as well. See Ill. S. Ct. Rule 366(a)(5) (eff. Feb. 1, 1994) (allowing reviewing court to "grant any relief *** that the case may require."); *In re K.E.*, 2022 IL App (5th) 210236, ¶ 79.

¶ 100   We do not find that request appropriate here, however. We acknowledge the delay in the issuing of the modified allocation judgment, but we would likewise note the intricate and lengthy judgment order the court produced, longer and more detailed than most allocation judgments we review. Under no circumstances could we infer a lack of effort or interest on the part of the trial

judge; to the contrary, it is clear that the court spent enormous time on this difficult matter and went to great lengths to produce an equitable result. Nor can we ignore that the period of time between the closing of proofs and the issuance of the judgment order took place entirely within the Covid-19 pandemic, which created significant and unprecedented challenges for both judges and litigants alike.

¶ 101   As far as the substance of the order, we disagree with Mother's characterizations of it, for the reasons we have already given. As noted, the court made its best effort, echoed by the GAL, to set clear rules for the parents so they could amicably—or at least not acrimoniously—share time with their son. We thus find no basis to assign a new judge.

¶ 102                                   CONCLUSION

¶ 103   The portion of the modified allocation judgment regarding the right of first refusal is vacated and the cause remanded, so that the trial court may specify the period of time that would trigger that right as required by section 602.3(b) of the Act. The portion of the modified allocation judgment denying injunctive relief is vacated. The cause is remanded so that the court may conduct whatever proceedings necessary and ultimately clarify its judgment vis-à-vis its previous order granting injunctive relief and Father's stipulation. The judgment is affirmed in all other respects.

¶ 104   Affirmed in part, vacated in part, and remanded.