**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2026 IL App (3d) 250367-U

Order filed April 8, 2026

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2026

| | | |
|---|---|---|
| JOSEPH GRASSER, | ) | Appeal from the Circuit Court |
| | ) | of the 12th Judicial Circuit, |
| Petitioner-Appellee, | ) | Will County, Illinois, |
| | ) | |
| v. | ) | Appeal No. 3-25-0367 |
| | ) | Circuit No. 23-FA-342 |
| KATELYN BORMIDA, | ) | |
| | ) | Honorable |
| Respondent-Appellant. | ) | Joan Meyers, |
| | ) | Judge, Presiding. |

_____

JUSTICE ANDERSON delivered the judgment of the court.
Justices Brennan and Davenport concurred in the judgment.

_____

**ORDER**

¶ 1     *Held*:  The trial court did not abuse its discretion in its determination regarding allocation of parental decision-making and parenting time.

¶ 2     This case involves the care of a 7-year-old child. In May 2025, the trial court entered an order allocating parental decision-making authority and parenting time in favor of the father, Joseph Grasser. The mother, Katelyn Bormida, appeals. We affirm.

¶ 3                                I. BACKGROUND

¶ 4    The parties were friends for several years before the birth of their child, J.O.B-G., in July 2018. They briefly lived together after the child's birth but separated in August 2018, after which the child primarily resided with Katelyn. Katelyn and the child lived in Alton and later Palatine, Illinois, until early 2023.

¶ 5    Joseph had intermittent involvement with the child during the early years, including visits and financial contributions toward childcare, though the parties dispute the extent of his involvement. In October 2022, an incident occurred between the parents that led to a breakdown in their relationship. Following that incident, Katelyn asked Joseph to cease contact with her, and the parties' communication deteriorated significantly. Despite this, some efforts were made to facilitate communication between Joseph and the child, with both parties offering differing accounts of the frequency and success of those efforts.

¶ 6    In early 2023, Katelyn relocated with the child to Iowa for a brief period before returning to Illinois and then moving to the St. Louis, Missouri, area. The circumstances of the relocation and the parties' ability to communicate during that period are disputed.

¶ 7    On May 8, 2023, Joseph filed petitions to establish parentage and allocate parental responsibilities. A judgment of paternity was entered on June 20, 2023, recognizing Joseph as the child's biological father. Temporary orders entered in mid-2023 provided Joseph with parenting time, including alternating weekends, and permitted Katelyn to reside in the St. Louis area with the child.

¶ 8    Following entry of temporary orders, the parties engaged in numerous ongoing disputes regarding parenting time, communication, and the child's participation in exchanges. Each party alleged that the other interfered with parenting time. Katelyn reported that the child resisted

2

exchanges and exhibited behavioral difficulties, while Joseph maintained that parenting time proceeded without issue when the child was in his care.

¶ 9 In December 2023, the court appointed a guardian *ad litem* (GAL) and found Katelyn in contempt on one count related to missed parenting time, awarding Joseph make-up time. The parties continued to file competing motions concerning missed visits, communication issues, and compliance with court orders.

¶ 10 On March 19, 2024, the court modified the parenting schedule, set exchange conditions, and ordered the parties to participate in parenting classes. Numerous disputes continued, including allegations that the child was not being produced for parenting time and that exchanges were not occurring as ordered.

¶ 11 On May 17, 2024, the court found Katelyn in indirect civil contempt for failure to comply with parenting time orders and transferred possession of the child to Joseph, suspending Katelyn's parenting time. The court subsequently granted Joseph temporary sole decision-making authority and restricted communication between the parties to a designated platform. Katelyn was later permitted limited phone contact and supervised parenting time.

¶ 12 A multi-day trial was held between April and May 2025 on the parties' pending petitions. The evidence reflected significant conflict between the parties, including disputes over parenting time compliance, communication, medical decisions, and the child's adjustment in each household.

¶ 13 Joseph testified that the child had resided with him since May 2024 and described the child as doing well in school, engaging in activities, and maintaining routines in his care. He testified that he facilitated contact with Katelyn through scheduled calls and visits but sought to limit the

frequency of those communications. He also testified that he had not received documentation supporting certain medical concerns raised by Katelyn.

¶ 14     Katelyn testified that she had been the child's primary caregiver prior to May 2024 and described her role in managing the child's medical care, education, and daily needs. She testified that the child experienced distress related to parenting exchanges and that logistical and financial issues affected her ability to comply with court-ordered parenting time following the custody transfer. She also testified regarding medical concerns and efforts to obtain evaluations for the child.

¶ 15     The GAL testified that she interviewed the parties, the child, and collateral sources, and reviewed relevant records. She reported that the child was functioning within normal expectations at school and had adjusted to his current environment. The GAL identified ongoing concerns regarding the parties' inability to communicate and co-parent effectively. She recommended that Joseph be awarded sole decision-making authority and primary parenting time, with Katelyn receiving parenting time subject to conditions.

¶ 16     Additional witnesses, including Katelyn's fiancée and her mother, also testified. Their testimony related to the child's behavior, the parties' interactions, and difficulties surrounding parenting time exchanges.

¶ 17     On May 27, 2025, the circuit court entered final orders awarding Joseph primary parenting time and sole decision-making authority. Katelyn was granted supervised parenting time on a limited basis, subject to conditions for potential expansion, and her phone contact with the child was reduced. The court also entered orders regarding child support.

¶ 18                                            II. ANALYSIS

¶ 19 On appeal, Katelyn raises two basic issues.[1] First, she argues that the trial court's decision to give Joseph sole decision-making authority was contrary to the manifest weight of the evidence and contrary to the child's best interest. Second, she argues that the trial court's parenting time decisions were contrary to the manifest weight of the evidence.

¶ 20 A. Decision-Making Authority

¶ 21 The Illinois Marriage and Dissolution of Marriage Act defines "parental responsibilities" as including "both parenting time and significant decision-making responsibilities with respect to a child." 750 ILCS 5/600(d) (West 2024). Allocation of significant decision-making responsibilities, including education, health (including medical, dental, and psychological needs), and religion, is to be determined based on the child's best interest. 750 ILCS 5/602.5(a) (West 2024).

¶ 22 In determining the child's best interests with respect to decision-making, the court is required to consider all relevant factors, including: (1) the wishes of the child, (2) the child's adjustment to his home, school, and community, (3) the mental and physical health of individuals

---

[1] Before addressing the petitioner's arguments, we note that this case was "accelerated" pursuant to Illinois Supreme Court Rule 311(a) (eff. July 1, 2018) because it involves the allocation of parenting responsibilities. Rule 311(a)(5) provides that "[e]xcept for good cause shown, the appellate court shall issue its decision within 150 days after the filing of the notice of appeal." *Id*. Because the notice of appeal was filed on September 8, 2025, the 150-day period expired on February 5, 2026. This court granted the parties' requests for extensions of time to file the record, the supplemental record, the appellant's brief, the appellee's brief, and the appellant's reply brief. Briefing was completed on March 27, 2026, and the case was submitted for decision on March 30, 3026. Since the appeal was not ready for disposition until after February 5, 2026, we find good cause for issuing this decision after the 150-day deadline. See *In re B'Yata I.*, 2013 IL App (2d) 130558, ¶ 26 (finding good cause where the briefs were submitted after the initial deadlines but one week before the 150-day decision deadline).

5

involved, (4) the ability of the parents to cooperate to make decisions, or the level of conflict between the parties that may affect their ability to share decision-making, (5) each parent's past participation in significant decision-making, (6) prior agreements or course of conduct between the parents relating to decision-making with respect to the child, (7) the wishes of the parents, (8) the child's needs, (9) the distance between the parties' residences, transportation, schedules, and the ability of the parents to cooperate in the arrangement, (10) whether a restriction on decision-making is appropriate under section 630.10 of the Act, (11) the willingness and ability of each parent to facilitate and encourage a close and continuing relationship between the other parent and the child, (12) any physical violence or threat of physical violence by the child's parent directed against the child, (13) any occurrence of abuse against the child or other household members, (14) whether either parent is a sex offender, and (15) any other relevant factor. *Id*. § 602.5(c).

¶ 23    A judgment regarding decision-making authority is reviewed under the manifest weight of the evidence standard. *In re Marriage of Bates*, 212 Ill. 2d 489, 515 (2004); *Young v. Herman*, 2018 IL App (4th) 170001, ¶ 64. A finding is against the manifest weight of the evidence "only if the opposite conclusion is clearly apparent or the decision is unreasonable, arbitrary, or not based on the evidence." *In re Keyon R*., 2017 IL App (2d) 160657, ¶ 16. When determining whether a judgment is contrary to the manifest weight of the evidence, we view the evidence in the light most favorable to the appellee, and where the evidence permits reasonable inferences, we accept those inferences that support the court's order. *Bates*, 212 Ill. 2d at 515. Custody determinations are highly deferential because the trial court is in a better position to determine witness credibility and to consider the child's best interests. *Id*.

¶ 24    Having reviewed the record, we cannot say that the trial court's allocation of decision-making authority is contrary to the manifest weight of the evidence. First, it is evident that joint

decision-making is not practicable between these parties. The record is replete with conflict. Indeed, it is marked by persistent disagreements regarding parenting time, communication, and the child's care. The evidence presented at trial demonstrated an ongoing inability of the parties to communicate effectively or engage in joint decision-making. Both parties filed repeated motions alleging noncompliance with court orders, and the litigation was characterized by reciprocal claims of interference with parenting time.

¶ 25        Further, the trial court heard evidence that the parties struggled to coordinate even routine parenting exchanges and communication. The GAL testified that the parties were not "on the same page about anything" and that productive, good-faith discussions between them were unlikely. This evidence directly implicates one of the central statutory considerations—whether the parents can cooperate in decision-making—and supports the court's determination that joint decision-making was not feasible.

¶ 26        Additionally, the evidence showed a lack of consistent engagement by Katelyn with certain aspects of the child's life following the May 2024 custody transfer. The GAL testified that Katelyn had not maintained regular contact with the child's school or service providers and had exercised only a portion of her available parenting time. While Katelyn offered explanations related to financial and logistical challenges, the trial court was entitled to weigh that testimony against the broader record in assessing her ability to participate in major decision-making.

¶ 27        Conversely, there was evidence that the child had adjusted to residing with Joseph, including regular school attendance, participation in activities, and stable routines. The GAL reported that the child was functioning within normal expectations and had adapted to his current environment. Although the parties disputed various aspects of the child's care, the court could reasonably consider this evidence in evaluating the stability of the child's present circumstances.

7

¶ 28    The record further reflects conflicting testimony regarding the child's medical needs and prior care. Katelyn testified that she pursued evaluations and treatment for certain conditions, while Joseph testified that he had not received documentation supporting those concerns. The GAL similarly noted the absence of corroborating records for some of the reported conditions. Resolving such conflicts in the evidence is the province of the trial court, not a reviewing court. *Binkowski v. International Health Systems, Inc.*, 2024 IL App (1st) 221557, ¶ 78.

¶ 29    Importantly, the GAL—after interviewing the parties, the child, and collateral sources— recommended that Joseph be awarded sole decision-making authority. While the trial court is not bound by the GAL's recommendation, it may give that recommendation appropriate weight, particularly where it is supported by the record. See *In re Marriage of Wycoff*, 266 Ill. App. 3d 408, 416 (1994) (recognizing the need to give weight to a GAL's recommendation).

¶ 30    Viewed as a whole, the evidence supports the trial court's determination that awarding sole decision-making authority to Joseph was in the child's best interests. The record demonstrates significant parental conflict, an inability to engage in cooperative decision-making, and competing narratives regarding the child's needs and care. In such circumstances, Illinois courts have consistently recognized that sole decision-making may be appropriate to provide stability and avoid ongoing conflict affecting the child. See, *e.g.*, *In re M.M.*, 2022 IL App (1st) 211144-U, ¶ 71 (stating that the trial court "simply chose a different path than granting sole decision-making authority to one parent, opting instead to craft a co-parenting allocation judgment that contains very specific and detailed rules to reduce the possibility of conflict. We cannot say that the court abused its discretion.").

¶ 31    Although the evidence was contested and, at times, sharply conflicting, the trial court's resolution of those conflicts does not render its decision against the manifest weight of the

8

evidence. The opposite conclusion—that joint decision-making or an allocation to Katelyn was required—is not clearly apparent from the record. Accordingly, the trial court's allocation of parental decision-making authority was not against the manifest weight of the evidence.

¶ 32                                    B. Parenting Time

¶ 33        Katelyn also challenges the trial court's decision relative to parenting time. The issue of allocation of parenting time is similarly considered according to the child's best interest (750 ILCS 5/602.7 (West 2024)), and the court is required to consider all relevant factors, including (1) the wishes of each parent, (2) the wishes of the child, (3) the amount of time each parent spent performing caretaking functions to the child in the 24 months preceding the filing of any petition for allocation of parental responsibilities, (4) any prior agreement or course of conduct between the parents relating to the caretaking of the child, (5) the interaction and interrelationship of the child with his parents, (6) the child's adjustment to his home, school, and community, (7) the mental and physical health of all individuals involved, (8) the child's needs, (9) the distance between the parties' residences, transportation, schedules, and the ability of the parents to cooperate in the arrangement, (10) whether a restriction on parenting time is appropriate, (11) any physical violence or threat of physical violence by the child's parent directed against the child, (12) the willingness and ability of each parent to place the child's needs ahead of his or her needs, (13) the willingness and ability of each parent to facilitate and encourage a close and continuing relationship between the other parent and the child, (14) any occurrence of child abuse, (15) whether one of the parents is a convicted sex offender or lives with a convicted sex offender, (16) either parents' military family-care plan, and (17) any other relevant factor. *Id*. § 602.7(b). Equal co-parenting arrangements have been set aside in cases where the evidence clearly shows the parents have too much animosity to be able to cooperate.

9

*In re Marriage of Virgin*, 2021 IL App (3d) 190650, ¶ 47. We will not overturn the trial court's parenting-time determination "unless the court abused its considerable discretion or its decision is against the manifest weight of the evidence." *In re Marriage of Whitehead & Newcomb-Whitehead*, 2018 IL App (5th) 170380, ¶ 15.

¶ 34     Again, this case involves claims of interference with parenting time, and the court was presented with evidence that exchanges were often prolonged, difficult, and, at times, unsuccessful. The child's participation in exchanges was inconsistent, and testimony indicated that transitions between households were a source of stress.

¶ 35     The court also heard evidence regarding Katelyn's inconsistent exercise of parenting time following the May 2024 orders. The GAL testified that Katelyn attended approximately half of her supervised visits and did not consistently comply with scheduling requirements. While Katelyn attributed missed visits to financial and transportation issues, the court was entitled to weigh those explanations against the impact of irregular contact on the child. The GAL noted that limited and inconsistent interactions were not beneficial for the child.

¶ 36     By contrast, there was evidence that the child had adjusted to residing with Joseph since May 2024. Joseph testified that the child was attending school regularly, participating in activities, and maintaining routines. The GAL similarly reported that the child was doing well in school, had made friends, and was functioning within normal expectations. The court could reasonably consider the stability of the child's current environment in determining an appropriate parenting schedule.

¶ 37     The court also considered the parties' ability (or lack thereof) to cooperatively facilitate a relationship between the child and the other parent. The record reflects ongoing communication difficulties and mutual distrust, with each party attributing blame to the other. The GAL expressed

10

concern regarding the parties' inability to co-parent effectively and identified behaviors that contributed to conflict during exchanges and communication. In a high-conflict case such as this, the court may reasonably structure parenting time in a manner that minimizes conflict and promotes consistency for the child.

¶ 38　　　　The resulting allocation—granting Joseph the majority of parenting time while limiting Katelyn to supervised parenting time with conditions for expansion—reflects a measured approach grounded in the evidence. The court did not permanently foreclose increased parenting time but instead conditioned modification on demonstrated consistency and compliance, thereby providing a pathway for expanded involvement while prioritizing the child's stability.

¶ 39　　　　Although the parties presented conflicting accounts regarding the child's behavior, parenting exchanges, and each parent's conduct, it was the trial court's role to resolve those conflicts. The evidence does not clearly favor an opposite result, nor does it render the court's determination unreasonable or arbitrary.

¶ 40　　　　Accordingly, the trial court's allocation of parenting time was supported by the record and was not an abuse of discretion. To the extent the rulings rests on factual findings, those findings are not against the manifest weight of the evidence.

¶ 41　　　　　　　　　　　　　　III. CONCLUSION

¶ 42　　　　We find that the trial court's determinations regarding parental decision-making and parenting time were not contrary to the manifest weight of the evidence, and we therefore affirm the trial court's decision.

¶ 43　　　　Affirmed.

11