NOTICE

Decision filed 08/07/23. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2023 IL App (5th) 230076-U

NO. 5-23-0076

IN THE

NOTICE

This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT
_____

| | | |
|---|---|---|
| *In re* PARENTAGE OF K.E. | ) | Appeal from the |
| | ) | Circuit Court of |
| (Nathan W., | ) | White County. |
| | ) | |
|     Petitioner-Appellee, | ) | |
| v. | ) | No. 14-F-46 |
| | ) | |
| Lindsay E., | ) | Honorable |
| | ) | Evan L. Owens, |
|     Respondent-Appellant). | ) | Judge, presiding. |

_____

JUSTICE CATES delivered the judgment of the court.
Justices Welch and Barberis concurred in the judgment.

**ORDER**

¶ 1      *Held*: The circuit court's visitation order was not against the manifest weight of the evidence. The respondent failed to demonstrate prejudice resulting from the circuit court's decision to allow a witness to testify.

¶ 2      The respondent, Lindsay E. (Mother), appeals from the judgment of the circuit court of White County, allocating decision making responsibilities and awarding parenting time to the petitioner, Nathan W. (Father). Mother additionally claims that the circuit court erred in allowing testimony from a witness who had been sitting in the courtroom after the circuit

1

court had excluded witnesses from the trial proceedings. For the following reasons, we affirm the circuit court's decision as modified.[1]

¶ 3                                    I. BACKGROUND

¶ 4    K.E. was born on September 17, 2009. Mother and Father, K.E.'s biological parents, were never married. When K.E. was a one-year-old, Father filed a petition to establish paternity and for sole custody of K.E. In 2013, that case was dismissed for want of prosecution. On December 22, 2014, when K.E. was five years old, Father filed a petition to establish paternity and visitation under the Illinois Parentage Act of 1984 (750 ILCS 45/3 (West 2014)). The trial began on April 26, 2021. The circuit court acknowledged that Father was the biological parent of K.E., and the circuit court established a visitation schedule, awarding equal parenting time between the parties, and joint decision-making responsibilities for education, medical, religious, and extracurricular activities. The original judgment allocating parental responsibilities and establishing a parenting plan was entered on July 8, 2021. Mother appealed the circuit court's decision.

¶ 5    On appeal, we reversed the judgment of the circuit court and remanded with directions. See *In re K.E.*, 2022 IL App (5th) 210236. We found that the circuit court erred in admitting an *ex parte* evidence deposition of an expert witness, where notice of the deposition was insufficient under Rule 206(a). Ill. S. Ct. R. 206(a) (eff. Oct. 1, 2019). See *In re K.E.*, 2022 IL App (5th) 210236. Because the circuit court relied on the evidence

---

[1]This decision was issued more than 150 days after the filing of the notice of appeal, for good cause, under Illinois Supreme Court Rule 311(a)(5) (eff. July 1, 2018), as the briefing schedule was amended pursuant to two requests for extensions of time by appellant to file her brief.

deposition and outdated report by the court-appointed expert witness, the circuit court's findings and conclusions were against the manifest weight of the evidence.

¶ 6 Prior to the initial trial, the parties participated in mediation and multiple visitation attempts as described in detail in *In re K.E.*, 2022 IL App (5th) 210236. Dr. Judy Osgood, Ph.D., a licensed clinical psychologist, evaluated K.E. on January 7, 2017, when K.E. was seven years old, and subsequently prepared a report on January 9, 2017. Dr. Osgood's report indicated that K.E. suffered from symptoms of posttraumatic stress disorder (PTSD). K.E. reported to Dr. Osgood that when he was five years, "I didn't want to go with [Father], he pulled me out of the house, he whipped me. [Mother] didn't see it." K.E. additionally reported that when he was seven years old, Father threatened to give him a "butt whipping" because he had forgotten where he went on New Year's Eve. Mother filed an emergency petition on January 12, 2017, asserting that K.E. was "scared, visibly shaken, and starts crying" due to forthcoming visitation with Father. Mother filed Dr. Osgood's report with her emergency petition.

¶ 7 On February 15, 2017, the circuit court appointed a mental health professional, Dr. Althoff, to evaluate the parties. Dr. Althoff completed reports on Mother and Father, but Dr. Althoff passed away before providing testimony in this case. The circuit court subsequently ordered Dr. Frank Kosmicki, Ph.D., a licensed clinical psychologist, to perform a custody examination, as well as mental health evaluations, on Mother, Father, and K.E. The circuit court permitted Dr. Kosmicki to obtain information previously relied on by Dr. Althoff.

¶ 8    On June 25, 2019, the circuit court entered an order requiring counseling sessions for K.E. with Dr. John Cooley. Dr. Cooley met with K.E. on several occasions. Dr. Cooley prepared a report dated December 30, 2019. He believed K.E. was doing well and K.E. did not have behavioral issues at home or at school. K.E. had anxiety about seeing Father. Dr. Cooley reported, "I have not heard anything of real concern that would suggest any change of visitation."

¶ 9    Dr. Osgood testified at the initial trial. Two additional reports, dated April 20, 2018, and May 20, 2019, were admitted into evidence, along with the January 9, 2017, report. After the circuit court entered judgment on July 8, 2021, K.E. did not receive further counseling. The parties followed the visitation schedule established by the circuit court for approximately six months until the decision was issued in *In re K.E.*, 2022 IL App (5th) 210236. After that time, Father's visitation ceased. K.E. was not evaluated by any of the experts after his time spent with Father, and no additional updated reports were prepared for the subsequent trial.

¶ 10    The second trial began on September 16, 2022. On the first day of the trial, Mother filed a motion for an *in camera* interview of K.E. The circuit court proceeded to hear evidence before addressing the motion.

¶ 11    Father called Mother to testify first. Mother testified that K.E. did not want to spend time with Father. Mother claimed that K.E. was mistreated while spending time with Father based on an incident where K.E. ran away from Father to avoid spending time with him. In the past, Mother had refused to allow Father to have visitation time with K.E., but she had always complied with the court ordered visitation schedule. Mother denied that she

4

"poisoned [her] son against his father." Mother additionally testified that after the decision in *In re K.E.*, 2022 IL App (5th) 210236, was issued, Father told K.E. not to return to Father's house. Mother believed that Father should not receive any parenting time with K.E.

¶ 12    After Mother testified, her attorney made a motion for "a rule on witnesses," to exclude witnesses from the courtroom. Both attorneys informed the circuit court that Father's wife, Lauren W., would not be called as a witness. As a result of these representations, Lauren remained in the courtroom when Father's testimony began.

¶ 13    Father then testified that he had been fighting for visitation of his son since K.E. was a one-year-old. The circuit court awarded Father visitation after the initial trial in 2021. K.E. lived with Father 50% of the time for a six-month period. Father testified that during that time, "the pressure seemed to be off of K.E.," and K.E. started "opening up more" to Father. During the time Father had visitation, they took a family vacation, and were able to go fishing, go boating, see movies, and go to dinner as a family. K.E. was able to spend time with his seven-year-old half-brother, G.W., and his 18-year-old stepsister. Father wished K.E. would live with him full-time, but he realized that a child needed both of his parents.

¶ 14    Father would help K.E. with his schoolwork. K.E.'s grades were "rocky at first." Father testified that there were "tough conversations" about paying attention and completing homework assignments. Father helped K.E. improve his grades. Father lived approximately five minutes from Mother. Lauren, Father's wife, handled transportation to and from school during Father's visitation time.

5

¶ 15 Father testified that after he received the decision in *In re K.E.*, 2022 IL App (5th) 210236, he had more "tough conversations" with K.E. Father explained that K.E. was not outspoken and Father tried for weeks to talk to K.E. about his thoughts on visitation. Father admitted that during those conversations, he told K.E. that "when you're dishonest, when you're disloyal, when you lie, I'm not going to reinforce that behavior at our home anymore." Father additionally testified that he had to "jump his butt about it."

¶ 16 After those conversations, K.E. stopped spending time with Father. Father testified that he would call or text about visitation time with K.E. and never received a response. Father testified to an instance where he attempted to pick up K.E. after track practice. K.E. left through the front door of the school to avoid Father and ran to Mother's house. Father maintained contact with K.E.'s teachers and coaches after the visitation stopped.

¶ 17 Father additionally testified that he loved K.E. and wanted the best for him. Father believed K.E. was a "good kid" and that he was able to "do anything he puts his mind to."

¶ 18 On cross-examination, Father was questioned regarding whether he teased K.E. about his weight. Father acknowledged that he called K.E., "Slim," or "Little Slim." Father claimed that the nickname, "Little Slim," was a compliment because K.E.'s grandfather's nickname was "Slim." Father described K.E.'s grandfather as "a big man" and he was "loved by many." Father additionally testified that K.E. recently started to lose weight and that "he's a big man." Father believed that K.E. did not want to spend time with Father.

¶ 19 During a break in Father's testimony, the parties discussed scheduling for the next trial date. Mother's attorney stated that he intended to call Dr. Osgood to testify as an expert witness. Father's attorney argued that Mother had not disclosed that she intended to call

6

Dr. Osgood as an expert witness. Therefore, he intended to call Lauren W. as a witness, if Dr. Osgood testified. The circuit court then excluded Lauren W. from the courtroom for the remainder of Father's testimony. Additionally, the circuit court requested that the parties disclose witnesses and any information concerning the witnesses by the following Monday. The circuit court additionally granted the *in camera* interview of K.E. without objection.

¶ 20 Father's testimony resumed, and Father continued to testify to issues that arose involving visitation after the decision in *In re K.E.*, 2022 IL App (5th) 210236. Father continued to appear for visitation and would call K.E., but Mother would not cooperate. Father testified that K.E. had been "dishonest" and "disloyal" to Father and his family. Father was hurt and yelled at K.E. because K.E. said that he did not want to continue visitation. Father claimed that Mother actively interfered with Father's relationship with K.E. Father did not believe that K.E. was scared of Father.

¶ 21 Father's friend, Brett Haley, testified that he had spent time with Father during visitation with K.E. Brett indicated that K.E. liked to fish and Brett would go fishing with Father and K.E. Brett never witnessed any issues between Father and K.E. Brett additionally testified that he observed K.E. interact with his half-brother, G.W. K.E. treated G.W. like a little brother, and they played well together.

¶ 22 When Father called Lauren W. to testify, Mother argued that Lauren should not be allowed to testify because she had remained in the courtroom after witnesses were excluded. The circuit court found that the parties had initially advised that the hearing was going to consist of testimony from the parties and an *in camera* interview of K.E. No expert

7

witnesses were expected to testify. During the course of the trial, Mother's counsel indicated that they were going to call an expert to testify. After that disclosure, midway through Father's testimony, Lauren left the courtroom as directed. The circuit court allowed testimony from Lauren.

¶ 23    Lauren testified that K.E. was "polite," "soft spoken," "very caring," and "happy." K.E. and his half-brother, G.W., would play video games together, wrestle, ride bikes, and fish. G.W. wanted to do everything with K.E. Lauren and Father would attend K.E.'s home basketball games and Father attended away games as well.

¶ 24    Lauren testified that the inconsistent visitation "caused a lot of stress." Lauren described her relationship with K.E. as "strained." She treated K.E. as her own child, but K.E. "put this wall up" and Lauren felt like K.E. was told not to like her. After the decision in *In re K.E.*, 2022 IL App (5th) 210236, K.E. became quiet and withdrawn.

¶ 25    Lauren believed that it would take time for K.E. to feel comfortable and happy at their home again. K.E. would be welcomed back and their family was not whole without K.E. Everyone missed him. Father rested his case after Lauren's testimony.

¶ 26    Mother then testified, on her own behalf, to her history with Father. At the end of 2009 or beginning of 2010, Father choked Mother in front of K.E. and Mother's daughter. After that incident, Mother wanted to protect K.E., and Father had no contact with K.E. for a period of two years. Father rarely saw K.E. from 2011 to 2014. In 2014, there was an incident where Father picked up K.E. for visitation and K.E. attempted to run away from Father. Father "beat him on his butt" after K.E. hopped out of Father's truck and attempted to run back into Mother's house. Then, in 2015 or 2016, Mother and Father participated in

8

mediation and Father received visitation time. K.E. would hide in the closet before visitation time with Father. Mother additionally testified that K.E. ran away from her once or twice. Mother "patted [K.E.] on the butt" when he was little to discipline K.E.

¶ 27   Mother testified that she did not think it was in K.E.'s best interest to allow Father to have visitation. During the last several years, K.E. had told Mother that verbal abuse occurred at Father's house from Father and Lauren. Mother believed that Father "belittled" K.E., which affected his self-confidence and self-esteem. K.E. has been self-conscious about his weight since Father began making comments in 2019. When K.E. found out that Father was awarded visitation after the initial trial, K.E. was upset and "bawled for like 2 or 3 hours." Mother did not send K.E. to the first visitation date with Father because K.E. was upset. K.E. continued to appear visibly stressed each time he had to go to Father's house. K.E.'s demeanor changed, he seemed "significantly happier," after visitation with Father stopped.

¶ 28   K.E. has received counseling from approximately five different professionals. K.E. has not received therapy or attended counseling sessions since the trial in 2021, after Father was awarded visitation. Mother testified that she "left it alone for a little bit." Mother has made every decision for K.E. throughout his life. Mother would have screaming matches with Father, and she has not had any "real contact" with Father for a couple years. Mother testified that she would not be able to make parenting decisions together with Father.

¶ 29   Visitation exchanges took place through the school to avoid conflict with the other parent. Mother lived two blocks from the school and K.E. would frequently walk home. Mother testified that Father did not pick up K.E. from school for a month. Then, when

9

Father attempted to pick up K.E. from school, K.E. ran away. After that incident, Father only called Mother once or twice. Mother did not answer, and she did not hear from Father again.

¶ 30 Mother testified that Father had a chance to fix his relationship with K.E. during the time they spent together, but their relationship worsened. Mother believed that it was best for K.E. if Father did not have visitation, regardless of the effect on K.E.'s relationship with G.W. Mother additionally testified that K.E.'s maternal grandmother passed away, and K.E. does not spend time with his maternal grandfather, uncle, or cousins.

¶ 31 Dr. Judy Osgood testified to her evaluation of K.E. Dr. Osgood first met K.E. in January of 2017, when K.E. was seven years old. She evaluated K.E. at that time because K.E. was going to start overnight visitation with Father and K.E. was exhibiting anxiety and distress. Dr. Osgood explained that she first spoke to Mother, individually, to obtain some background before meeting with K.E. She met with K.E. individually. After one interview with K.E., Dr. Osgood diagnosed K.E. with PTSD. She never met with Father and has never been contacted by Father.

¶ 32 Dr. Osgood testified that she met with K.E. a total of 12 times, from 2017 to 2021. During those sessions, K.E. had disclosed anxiety and a fear of Father. K.E. felt like no one would listen to his concerns regarding this case. When K.E. was required to speak to the guardian *ad litem* (GAL) or another professional, Father and Lauren would confront K.E. and "would be mad at him." K.E.'s anxiety increased after those confrontations. When Dr. Osgood last met with K.E. in 2021, K.E. indicated that he was afraid of Father. Father

and Lauren would call K.E. "fat" and made fun of K.E.'s weight in front of other people, which made K.E. feel like he should stop eating.

¶ 33   Dr. Osgood testified that K.E. was diagnosed with "parent-child relational problem," PTSD, and child psychological abuse due to remarks made by Father about K.E.'s weight. In June of 2021, Dr. Osgood recommended that K.E. should not have overnight visitation with Father until some progress could be made with K.E. feeling supported by Father. At that time, Dr. Osgood had concerns about K.E.'s anxiety because he was distressed and not sleeping.

¶ 34   Dr. Osgood recommended that K.E. have a licensed mental health therapist who would not communicate with the court or with K.E.'s parents. She felt that it would be in K.E.'s best interest to have parenting time with Father if there were changes in the parenting time and in their relationship. Father needed to demonstrate empathy and communicate with K.E. for K.E. to feel like Father understood and cared about K.E. K.E. had shared positive experiences with Dr. Osgood about the time he spent with Father, such as fishing together.

¶ 35   Dr. Osgood had not met with K.E. since 2021. She was unaware of whether K.E.'s relationship with Father had improved since 2021, after the circuit court awarded 50/50 visitation. Dr. Osgood's reports dated January 9, 2017, April 20, 2018, and May 20, 2019, were admitted into evidence.

¶ 36   On cross-examination, Dr. Osgood acknowledged that the background information she received was only from Mother's version of what had occurred. Dr. Osgood was aware that Mother had significant mental health issues. She was also aware that other

11

professionals met with Mother, Father, and K.E. over the course of the case and that her recommendations were different from the recommendations of the other professionals. Dr. Osgood had reviewed the report from Dr. Kosmicki, the court appointed expert witness that evaluated Mother, Father, and K.E. before the initial trial. Dr. Osgood agreed with Dr. Kosmicki's opinion that K.E.'s primary attachment and bond was with Mother, and to drastically change that bond would be difficult for K.E. In her opinion, forcing a "big change" could interfere with K.E.'s ability to "form a better relationship" with Father. Dr. Osgood did not agree with every finding in Dr. Kosmicki's report and Dr. Kosmicki's report was not offered into evidence.

¶ 37 After the circuit court conducted an *in camera* interview of K.E., the parties presented closing arguments. On January 13, 2023, the circuit court entered its findings and conclusions. The circuit court stated that it had considered the statutory factors set forth in section 602.7 of the Illinois Marriage and Dissolution of Marriage Act (Act) (750 ILCS 5/602.7 (West 2022)) in reaching its decision. The circuit court found that in the last 24 months, and prior to that time, Mother was K.E.'s primary caretaker. Mother and Father were unable to reach any agreements since K.E.'s birth. K.E. has positive memories with family members in both Mother and Father's households. The circuit court determined that there was no conduct which would cause a parent to be unfit or cause a restriction of parenting time. K.E. was not found to be abused by Father. The circuit court believed that there was a "disagreement in parenting approach," and both households needed to improve.

¶ 38    The circuit court found that Mother should have a majority of parenting time and sole decision-making responsibility. Mother was required to consult with Father on major issues, at least twice within a 14-day period.

¶ 39    The circuit court was concerned with K.E.'s lack of relationships with family members. K.E. missed his younger brother. The circuit court considered Dr. Osgood's testimony. The circuit court further determined that it was not going to "cut off a parent's fundamental rights to parent and never have that reestablished" where efforts were made by Father. The circuit court also considered that the parties have "already stair-stepped this along." Father was awarded parenting time starting on Wednesday evenings. Parenting time incrementally increased. Starting on March 6, 2023, Father was granted parenting time every other Thursday from 4 p.m., until Sunday at 6 p.m., and every Wednesday evening from 4 p.m. until 8 p.m. Both Mother and Father were granted two nonconsecutive weeks in the summertime. This appeal followed.

¶ 40                                    II. ANALYSIS

¶ 41    On appeal, Mother argues that the circuit court's judgment was against the manifest weight of the evidence where no restrictions were imposed on Father's parenting time and parenting time increased without requiring any evaluations as to the parent-child relationship. Mother additionally argues that the circuit court erred in allowing testimony from Lauren W. after witnesses were excluded from the courtroom and Lauren remained.

¶ 42    The allocation of parenting time is made in accordance with the child's best interest. 750 ILCS 5/602.7(a) (West 2022). In allocating parenting time, the circuit court shall consider all relevant factors, including (1) the parent's wishes; (2) the child's wishes;

(3) the amount of time that each parent spent performing caretaking functions with respect to the child in the 24 months preceding the filing of any petition for allocation of parental responsibilities; (4) any prior agreement or course of conduct between the parents relating to caretaking functions; (5) the interaction and interrelationship of the child with his parents and siblings and with any other person who may significantly affect his best interests; (6) the child's adjustment to his home, school, and community; (7) the mental and physical health of all individuals involved; (8) the child's needs; (9) the distance between the parents' residences, the cost and difficulty of transporting the child, the parents' and child's daily schedules, and the ability of the parents to cooperate in the arrangement; (10) whether a restriction on parenting time is appropriate; (11) the physical violence or threat of physical violence by the child's parent directed against the child or other member of the child's household; (12) each parent's willingness and ability to place the child's needs ahead of his or her own; (13) each parent's willingness and ability to facilitate and encourage a close and continuing relationship between the other parent and the child; (14) the occurrence of abuse against the child or other member of the child's household; (15) whether one parent is a sex offender or resides with a sex offender; (16) the terms of the parent's military family-care plan if a parent is a member of the United States Armed Forces who is being deployed; and (17) any other factor that the court expressly finds to be relevant. 750 ILCS 5/602.7(b) (West 2022).

¶ 43 A restriction of parenting time is appropriate if a parent's conduct has seriously endangered the child's mental, moral, or physical health or significantly impaired the child's emotional development. 750 ILCS 5/603.10 (West 2022). The party seeking the

restriction has the burden to establish by a preponderance of the evidence that conduct has seriously endangered the child. 750 ILCS 5/603.10 (West 2022). The circuit court shall enter an order as necessary to protect the child. 750 ILCS 5/603.10 (West 2022). The circuit court may, when appropriate, order a reduction, elimination, or other alteration of parenting time, including ordering supervised visits. 750 ILCS 5/603.10(a)(1) (West 2022). "A reduction of weekend and summer visitation is not considered a restriction of visitation." *In re Marriage of Ross*, 355 Ill. App. 3d 1162, 1167 (2005). The circuit court may also require a parent to complete treatment for perpetrators of abuse, drug or alcohol abuse, or for other behavior or order. 750 ILCS 5/603.10(a)(8) (West 2022).

¶ 44 "Sound public policy encourages the maintenance of the parent-child relationship, and only in extreme circumstances may courts deprive a parent of visitation." *In re Parentage of K.E.B.*, 2014 IL App (2d) 131332, ¶ 31. A circuit court's allocation of parenting time will not be disturbed unless it is against the manifest weight of the evidence. *In re Marriage of Virgin*, 2021 IL App (3d) 190650, ¶ 45. The circuit court is afforded great deference in allocating parenting time because the circuit court is in the best position to assess the credibility of the witnesses to determine the child's best interest. *In re Marriage of Virgin*, 2021 IL App (3d) 190650, ¶ 45.

¶ 45 The circuit court considered the statutory factors pursuant to section 602.7(b) of the Act (750 ILCS 5/602.7(b) (West 2022)) in making its determination. Mother and Father's wishes, along with K.E.'s desires, were also considered by the circuit court. Mother and Father lived near each other and close to school, where the visitation exchange took place. K.E.'s grades were improving, and he was involved in extracurricular activities. After the

initial trial, Father had overnight visitation for half of the time for a six-month period. During that time, K.E. went on vacation with Father's family, fished, and enjoyed other activities with Father. K.E. missed spending time with his half-brother when K.E. stopped spending time with Father.

¶ 46 Mother argues that the circuit court erred by not restricting Father's visitation time. The circuit court observed the witnesses and considered that "both households need to improve their parenting approach." After our last decision was issued, Father confronted K.E. about visitation. Testimony was presented that K.E. and Father's relationship suffered because of Father's reactions to K.E.'s responses during their conversations. We agree with Mother that Father's nickname for K.E. and the decision to mock K.E.'s physical appearance is concerning. Nevertheless, we must assume that the circuit court took this issue into consideration, along with all of the evidence and the factors outlined above, and we cannot say that the circuit court's ruling regarding visitation is erroneous.

¶ 47 Mother has not established that Father's conduct seriously endangers K.E. Dr. Osgood last saw K.E. in 2021, prior to the six-month period when K.E. spent a significant amount of time with Father. K.E. has not received therapy or attended any counseling sessions since Father exercised visitation after the initial trial. The circuit court considered the testimony of the witnesses, including Dr. Osgood, and determined that K.E. was not subjected to physical violence, or threat of physical violence, at Father's home.

¶ 48 Mother, in the alternative, claims that the circuit court should have generally reduced the amount of time K.E. spends with Father on the weekends and during summer break. The circuit court determined that the majority of parenting time should be spent with

16

Mother. The judgment awarded Father a couple hours of parenting time a week and incrementally increased visitation time to three overnight visits every other weekend. The circuit court's decision in awarding this schedule of visitation time to Father is not against the manifest weight of the evidence.

¶ 49    In our review of this order, we do note that the requirement of notice as it relates to significant decisions may be unworkable. Mother was granted sole decision-making responsibility, but has to give Father notice at least twice in a 14-day period. In the event of an emergency, this is obviously not a workable solution. Therefore, pursuant to our authority under Illinois Supreme Court Rule 366(a)(5) (eff. Feb. 1, 1994), we hereby amend that portion of the circuit court's order to read as follows:

> C.  Respondent *(mother)* shall be the sole decision maker with respect to all major decisions however, *to the extent possible*, mother must discuss each major decision with father on at least two occasions over a period of 14 days before making a final decision.[2]

¶ 50    We next turn to Mother's argument of whether the circuit court erred in allowing a witness to testify who remained in the courtroom after the rule of witnesses was invoked. A circuit court possesses the discretion to exclude witnesses from the courtroom during a trial. *In re D.L.*, 226 Ill. App. 3d 177, 187 (1992). The purpose of removing witnesses from the courtroom is to discourage fabrication and prevent a witness from shaping their testimony to conform to the testimony of other witnesses. *Smith v. City of Chicago*, 299 Ill. App. 3d 1048, 1053 (1998); see Ill. R. Evid. 615 (eff. Jan. 1. 2011) ("At the request of a party the court shall order witnesses excluded so that they cannot hear the testimony of

---

[2]The italicized words represent the changes to the circuit court's order dated January 13, 2023.

other witnesses \*\*\*."). The burden of proof is on the party alleging error to show prejudice resulting from the circuit court's decision to allow a witness to testify. *People v. Wiatr*, 119 Ill. App. 3d 468, 473 (1983).

¶ 51    Here, the circuit court allowed Father's wife, Lauren, to remain in the courtroom during the trial based on the representations by each of the parties that only Mother, Father, and K.E. were going to testify. After Lauren heard a substantial portion of Father's testimony, the parties discussed having additional witnesses testify. Father then decided to call Lauren as a witness to testify on Father's behalf. Subsequent to this disclosure, the circuit court removed Lauren from the courtroom for the remainder of Father's testimony.

¶ 52    Mother fails to explain how Lauren's testimony was prejudicial. Lauren had testified during the first trial. We do not find any evidence that Lauren altered her testimony to conform with Father's testimony or to rehabilitate Father's testimony. Without some showing of prejudice, we cannot say that Mother's claim that she was prejudiced by the circuit court's decision to allow Lauren to testify after she had remained in the courtroom for a portion of Father's testimony was an abuse of the circuit court's discretion.

¶ 53                                  III. CONCLUSION

¶ 54    For the reasons stated, we affirm the judgment of the circuit court of White County as modified.


¶ 55    Affirmed as modified.